## NIKE, INC., ET AL. *v.* KASKY

No. 02–575.   Argued April 23, 2003—Decided June 26, 2003

*Laurence H. Tribe* argued the cause for petitioners.   With him on the briefs were *Thomas C. Goldstein, Amy Howe, Walter Dellinger, David J. Brown,* and *James N. Penrod.*

*Solicitor General Olson* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Assistant Attorney General McCallum, Deputy Solicitor General Clement, Jeffrey P. Minear,* and *Jeffrey A. Lamken.*

*Paul R. Hoeber* argued the cause for respondent.   With him on the brief were *Alan M. Caplan, Roderick P. Bushnell, Patrick J. Coughlin, Randi Dawn Bandman, Albert H. Meyerhoff,* and *Sylvia Sum.**

*Briefs of *amici curiae* urging reversal were filed for ABC Inc. et al. by *Bruce E. H. Johnson, P. Cameron DeVore, Kelli L. Sager, Henry S. Hoberman, Theresa A. Chmara, Richard M. Schmidt, Jr., David A. Schulz, R. Bruce Rich, Jonathan Bloom, Susanna M. Lowy, Anthony M. Bongiorno, Harold W. Fuson, Jr., Jonathan R. Donnellan, Stuart D. Karle, Barbara W. Wall, Jack N. Goodman, James M. Lichtman, Neal A. Jackson, George Freeman, René P. Milam, Henry Z. Horbaczewski, Lucy A. Dalglish, Jane E. Kirtley, Bruce W. Sanford, Robin Bierstedt, Karlene W. Goller,* and *Eric N. Lieberman;* for the American Civil Liberties Union et al. by *Mark J. Lopez, Steven R. Shapiro,* and *Ann Brick;* for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess,* and *Laurence Gold;* for the Arthur W. Page Society et al. by *Bruce P. Keller* and *Michael R. Potenza;* for the Association of National Advertising, Inc., et al. by *Howard J. Rubin* and *Cory Greenberg;* for the Business Roundtable by *Carter G. Phillips, Alan Charles Raul,* and *Joseph R. Guerra;* for the Center for Individual Freedom by *Erik S. Jaffe* and *Renee L. Giachino;* for the Center for the Advancement of Capitalism by *Thomas A. Bowden;* for the Chamber of Commerce of the United States of America by *Kenneth W. Starr, Richard A.*

PER CURIAM.

The writ of certiorari is dismissed as improvidently granted.

---

*Cordray,* and *Robin S. Conrad;* for the Civil Justice Association of California by *Fred J. Hiestand;* for Defenders of Property Rights et al. by *Nancie G. Marzulla* and *Roger J. Marzulla;* for ExxonMobil et al. by *David H. Remes;* for the National Association of Manufacturers by *Andrew L. Frey, Andrew H. Schapiro, Kenneth S. Geller, David M. Gossett, Martin H. Redish, Jan S. Amundson,* and *Quentin Riegel;* for the Pacific Legal Foundation et al. by *Deborah J. La Fetra;* for Pfizer Inc. by *Bert W. Rein, Jeffrey B. Kindler,* and *Steven C. Kany;* for the Product Liability Advisory Council, Inc., by *Steven G. Brody;* for SRiMedia et al. by *Thomas H. Clarke, Jr.;* for the Thomas Jefferson Center for the Protection of Free Expression et al. by *Robert M. O'Neil* and *J. Joshua Wheeler;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Manuel Medeiros,* State Solicitor General, *Richard M. Frank,* Chief Assistant Attorney General, *Herschel T. Elkins,* Senior Assistant Attorney General, and *Ronald A. Reiter,* Supervising Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Gregg D. Renkes* of Alaska, *Terry Goddard* of Arizona, *Richard Blumenthal* of Connecticut, *Charles J. Crist, Jr.,* of Florida, *Lisa Madigan* of Illinois, *Richard Ieyoub* of Louisiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Mike Hatch* of Minnesota, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Wayne Stenehjem* of North Dakota, *Jim Petro* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Anabelle Rodríguez* of Puerto Rico, *Lawrence E. Long* of South Dakota, *William H. Sorrell* of Vermont, and *Darrell V. McGraw, Jr.,* of West Virginia; for the Campaign Legal Center by *Trevor Potter;* for the Consumer Attorneys of California by *Sharon J. Arkin;* for Domini Social Investments LLC et al. by *James E. Pfander;* for Global Exchange by *William Aceves;* for the National Association of Consumer Advocates by *Robert M. Bramson;* for Public Citizen by *Alan B. Morrison, Allison M. Zieve, Scott L. Nelson,* and *David C. Vladeck;* for ReclaimDemocracy.org by *Brenda Wright, Lisa J. Danetz, John C. Bonifaz,* and *Bonita Tenneriello;* for the Sierra Club et al. by *Patrick Gallagher* and *Thomas McGarity;* and for Representative Dennis J. Kucinich et al. by *Erwin Chemerinsky* and *Catherine Fisk.*

*William Perry Pendley* and *Joseph F. Becker* filed a brief for the Mountain States Legal Foundation as *amicus curiae.*

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, and with whom JUSTICE SOUTER joins as to Part III, concurring.

Beginning in 1996, Nike was besieged with a series of allegations that it was mistreating and underpaying workers at foreign facilities. See App. to Pet. for Cert. 3a. Nike responded to these charges in numerous ways, such as by sending out press releases, writing letters to the editors of various newspapers around the country, and mailing letters to university presidents and athletic directors. See *id.*, at 3a–4a. In addition, in 1997, Nike commissioned a report by former Ambassador to the United Nations Andrew Young on the labor conditions at Nike production facilities. See *id.*, at 67a. After visiting 12 factories, "Young issued a report that commented favorably on working conditions in the factories and found no evidence of widespread abuse or mistreatment of workers." *Ibid.*

In April 1998, respondent Marc Kasky, a California resident, sued Nike for unfair and deceptive practices under California's Unfair Competition Law, Cal. Bus. & Prof. Code Ann. § 17200 *et seq.* (West 1997), and False Advertising Law, § 17500 *et seq.* Respondent asserted that "in order to maintain and/or increase its sales," Nike made a number of "false statements and/or material omissions of fact" concerning the working conditions under which Nike products are manufactured. Lodging of Petitioners 2 (¶ 1). Respondent alleged "no harm or damages whatsoever regarding himself individually," *id.*, at 4–5 (¶ 8), but rather brought the suit "on behalf of the General Public of the State of California and on information and belief," *id.*, at 3 (¶ 3).

Nike filed a demurrer to the complaint, contending that respondent's suit was absolutely barred by the First Amendment. The trial court sustained the demurrer without leave to amend and entered a judgment of dismissal. App. to Pet. for Cert. 80a–81a. Respondent appealed, and the California Court of Appeal affirmed, holding that Nike's statements

"form[ed] part of a public dialogue on a matter of public concern within the core area of expression protected by the First Amendment." *Id.*, at 79a. The California Court of Appeal also rejected respondent's argument that it was error for the trial court to deny him leave to amend, reasoning that there was "no reasonable possibility" that the complaint could be amended to allege facts that would justify any restrictions on what was—in the court's view—Nike's "noncommercial speech." *Ibid.*

On appeal, the California Supreme Court reversed and remanded for further proceedings. The court held that "[b]ecause the messages in question were directed by a commercial speaker to a commercial audience, and because they made representations of fact about the speaker's own business operations for the purpose of promoting sales of its products, . . . [the] messages are commercial speech." 27 Cal. 4th 939, 946, 45 P. 3d 243, 247 (2002). However, the court emphasized that the suit "is still at a preliminary stage, and that whether any false representations were made is a disputed issue that has yet to be resolved." *Ibid.*

We granted certiorari to decide two questions: (1) whether a corporation participating in a public debate may "be subjected to liability for factual inaccuracies on the theory that its statements are 'commercial speech' because they might affect consumers' opinions about the business as a good corporate citizen and thereby affect their purchasing decisions"; and (2) even assuming the California Supreme Court properly characterized such statements as commercial speech, whether the "First Amendment, as applied to the states through the Fourteenth Amendment, permit[s] subjecting speakers to the legal regime approved by that court in the decision below." Pet. for Cert. i. Today, however, the Court dismisses the writ of certiorari as improvidently granted.

In my judgment, the Court's decision to dismiss the writ of certiorari is supported by three independently sufficient

reasons: (1) the judgment entered by the California Supreme Court was not final within the meaning of 28 U. S. C. § 1257; (2) neither party has standing to invoke the jurisdiction of a federal court; and (3) the reasons for avoiding the premature adjudication of novel constitutional questions apply with special force to this case.

I

The first jurisdictional problem in this case revolves around the fact that the California Supreme Court never entered a final judgment. Congress has granted this Court appellate jurisdiction with respect to state litigation only after the highest state court in which judgment could be had has rendered a final judgment or decree. See *ibid.* A literal interpretation of the statute would preclude our review whenever further proceedings remain to be determined in a state court, "no matter how dissociated from the only federal issue" in the case. *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 124 (1945). We have, however, abjured such a "mechanical" construction of the statute, and accepted jurisdiction in certain exceptional "situations in which the highest court of a State has finally determined the federal issue present in a particular case, but in which there are further proceedings in the lower state courts to come." *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 477 (1975).[1]

Nike argues that this case fits within the fourth category of such cases identified in *Cox,* which covers those cases in which "the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review" might prevail on nonfederal grounds, "reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action,"

---

[1] Notably, we recognized in *Cox* that in most, if not all, of these exceptional situations, the "additional proceedings anticipated in the lower state courts . . . would not require the decision of other federal questions that might also require review by the Court at a later date." 420 U. S., at 477.

and "refusal immediately to review the state-court decision might seriously erode federal policy." *Id.*, at 482–483. In each of the three cases that the Court placed in the fourth category in *Cox*, the federal issue had not only been finally decided by the state court, but also would have been finally resolved by this Court whether the Court agreed or disagreed with the state court's disposition of the issue. Thus, in *Construction Laborers* v. *Curry*, 371 U. S. 542 (1963), the federal issue was whether the National Labor Relations Board had exclusive jurisdiction over the controversy; in *Mercantile Nat. Bank at Dallas* v. *Langdeau*, 371 U. S. 555 (1963), the federal issue was whether a special federal venue statute applied to immunize the defendants in a state-court action; and in *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974), the federal issue was whether a Florida statute requiring a newspaper to carry a candidate's reply to an editorial was constitutional. In *Cox* itself, the federal question was whether the State could prohibit the news media from publishing the name of a rape victim. In none of those cases would the resolution of the federal issue have been affected by further proceedings.

In Nike's view, this case fits within the fourth *Cox* category because if this Court holds that Nike's speech was noncommercial, then "reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action." 420 U. S., at 482–483; see also Reply Brief for Petitioners 4; Reply to Brief in Opposition 4–5. Notably, Nike's argument assumes that all of the speech at issue in this case is either commercial or noncommercial and that the speech therefore can be neatly classified as either absolutely privileged or not.

Theoretically, Nike is correct that we could hold that *all* of Nike's allegedly false statements are absolutely privileged even if made with the sort of "malice" defined in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), thereby precluding any further proceedings or amendments that might over-

come Nike's First Amendment defense. However, given the interlocutory posture of the case before us today, the Court could also take a number of other paths that would neither preclude further proceedings in the state courts, nor finally resolve the First Amendment questions in this case. For example, if we were to affirm, Nike would almost certainly continue to maintain that some, if not all, of its challenged statements were protected by the First Amendment and that the First Amendment constrains the remedy that may be imposed. Or, if we were to reverse, we might hold that the speech at issue in this case is subject to suit only if made with actual malice, thereby inviting respondent to amend his complaint to allege such malice. See Tr. of Oral Arg. 42–43. Or we might conclude that some of Nike's speech is commercial and some is noncommercial, thereby requiring further proceedings in the state courts over the legal standards that govern the commercial speech, including whether actual malice must be proved.

. In short, because an opinion on the merits in this case could take any one of a number of different paths, it is not clear whether reversal of the California Supreme Court would "be preclusive of any further litigation on the relevant cause of action [in] the state proceedings still to come." *Cox*, 420 U. S., at 482–483. Nor is it clear that reaching the merits of Nike's claims now would serve the goal of judicial efficiency. For, even if we were to decide the First Amendment issues presented to us today, more First Amendment issues might well remain in this case, making piecemeal review of the Federal First Amendment issues likely. See *Flynt* v. *Ohio*, 451 U. S. 619, 621 (1981) *(per curiam)* (noting that in most, if not all, of the cases falling within the four *Cox* exceptions, there was "no probability of piecemeal review with respect to federal issues"). Accordingly, in my view, the judgment of the California Supreme Court does not fall within the fourth *Cox* exception and cannot be regarded as final.

## II

The second reason why, in my view, this Court lacks jurisdiction to hear Nike's claims is that neither party has standing to invoke the jurisdiction of the federal courts. See *Whitmore* v. *Arkansas*, 495 U. S. 149, 154–155 (1990) ("Article III, of course, gives the federal courts jurisdiction over only 'cases and controversies,' and the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process"). Without alleging that he has any personal stake in the outcome of this case, respondent is proceeding as a private attorney general seeking to enforce two California statutes on behalf of the general public of the State of California. He has not asserted any federal claim; even if he had attempted to do so, he could not invoke the jurisdiction of a federal court because he failed to allege any injury to himself that is "distinct and palpable." *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975). Thus, respondent does not have Article III standing. For that reason, were the federal rules of justiciability to apply in state courts, this suit would have been "dismissed at the outset." *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 617 (1989).[2]

Even though respondent would not have had standing to commence suit in federal court based on the allegations in the complaint, Nike—relying on *ASARCO*—contends that it has standing to bring the case to this Court. See Reply Brief for Petitioners 5. In *ASARCO*, a group of taxpayers brought a suit in state court seeking a declaration that the State's law on mineral leases on state lands was invalid. After the Arizona Supreme Court "granted plaintiffs a declaratory judgment that the state law governing mineral

---

[2] Because the constraints of Article III do not apply in state courts, see *ASARCO*, 490 U. S., at 617, the California courts are free to adjudicate this case.

leases is invalid," 490 U. S., at 611,[3] the defendants sought to invoke the jurisdiction of this Court. In holding that the defendants had standing to invoke the jurisdiction of the federal courts, we noted that the state proceedings had "resulted in a final judgment altering tangible legal rights," *id.*, at 619, and we adopted the following rationale:

> "When a state court has issued a judgment in a case where plaintiffs in the original action had no standing to sue under the principles governing the federal courts, we may exercise our jurisdiction on certiorari if the judgment of the state court causes direct, specific, and concrete injury to the parties who petition for·our review, where the requisites of a case or controversy are also met." *Id.*, at 623–624.

The rationale supporting our jurisdictional holding in *ASARCO*, however, does not extend to this quite different case. Unlike *ASARCO*, in which the state-court proceedings ended in a declaratory judgment invalidating a state law, no "final judgment altering tangible legal rights" has been entered in the instant case. *Id.*, at 619. Rather, the California Supreme Court merely held that respondent's complaint was sufficient to survive Nike's demurrer and to allow the case to go forward. To apply *ASARCO* to this case would effect a drastic expansion of *ASARCO*'s reasoning, extending it to cover an interlocutory ruling that merely allows a trial to proceed.[4] Because I do not believe such a

---

[3] The Arizona Supreme Court also remanded the case for the trial court to determine what further relief might be appropriate. See *id.*, at 611. Thus, while leaving open the question of remedy on remand, the state-court judgment in *ASARCO* finally decided the federal issue. See *id.*, at 612 (holding that the federal issues had been adjudicated by the state court and that the remaining issues would not give rise to any further federal question).

[4] JUSTICE BREYER would extend *ASARCO*—which provides an exception to our normal standing requirement—to encompass not merely a defendant's challenge to an adverse state-court judgment but also a

significant expansion of *ASARCO* is warranted, my view is that Nike lacks the requisite Article III standing to invoke this Court's jurisdiction.

## III

The third reason why I believe this Court has appropriately decided to dismiss the writ as improvidently granted centers around the importance of the difficult First Amendment questions raised in this case. As Justice Brandeis famously observed, the Court has developed, "for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Ashwander* v. *TVA,* 297 U. S. 288, 346 (1936) (concurring opinion). The second of those rules is that the Court will not anticipate a question of constitutional law in advance of the necessity of deciding it. *Id.,* at 346–347. The novelty and importance of the constitutional questions presented in this case provide good reason for adhering to that rule.

This case presents novel First Amendment questions because the speech at issue represents a blending of commercial speech, noncommercial speech and debate on an issue of public importance.[5] See *post,* at 676–678. On the one hand,

---

defendant's motion to dismiss a state-court complaint alleging that semi-commercial speech was false and misleading. See *post,* at 668–670 (dissenting opinion). Regardless of whether the "speech-chilling injury" associated with the defense of such a case may or may not outweigh the benefit of having a public forum in which the defendant may establish the truth of the contested statements, such an unprecedented expansion would surely change the character of our standing doctrine, greatly extending *ASARCO*'s reach.

[5] Further complicating the novel First Amendment issues in this case is the fact that in this Court Nike seeks to challenge the constitutionality of the private attorney general provisions of California's Unfair Competition Law and False Advertising Law. It apparently did not raise this specific challenge below. Whether the scope of protection afforded to Nike's speech should differ depending on whether the speech is challenged in a

if the allegations of the complaint are true, direct communications with customers and potential customers that were intended to generate sales—and possibly to maintain or enhance the market value of Nike's stock—contained significant factual misstatements. The regulatory interest in protecting market participants from being misled by such misstatements is of the highest order. That is why we have broadly (perhaps overbroadly) stated that "there is no constitutional value in false statements of fact." *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974). On the other hand, the communications were part of an ongoing discussion and debate about important public issues that was concerned not only with Nike's labor practices, but with similar practices used by other multinational corporations. See Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 2. Knowledgeable persons should be free to participate in such debate without fear of unfair reprisal. The interest in protecting such participants from the chilling effect of the prospect of expensive litigation is therefore also a matter of great importance. See, *e. g.,* Brief for ExxonMobil et al. as *Amici Curiae* 2; Brief for Pfizer Inc. as *Amicus Curiae* 11–12. That is why we have provided such broad protection for misstatements about public figures that are not animated by malice. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).

Whether similar protection should extend to cover corporate misstatements made about the corporation itself, or whether we should presume that such a corporate speaker knows where the truth lies, are questions that may have to be decided in this litigation. The correct answer to such questions, however, is more likely to result from the study of a full factual record than from a review of mere unproven allegations in a pleading. Indeed, the development of such

---

public or a private enforcement action, see *post,* at 678, is a difficult and important question that I believe would benefit from further development below.

a record may actually contribute in a positive way to the public debate. In all events, I am firmly convinced that the Court has wisely decided not to address the constitutional questions presented by the certiorari petition at this stage of the litigation.

Accordingly, I concur in the decision to dismiss the writ as improvidently granted.

JUSTICE KENNEDY, dissenting.

I dissent from the order dismissing the writ of certiorari as improvidently granted.

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, dissenting.

During the 1990's, human rights and labor groups, newspaper editorial writers, and others severely criticized the Nike corporation for its alleged involvement in disreputable labor practices abroad. See Lodging of Petitioners 7–8, 96–118, 127–162, 232–235, 272–273. This case focuses upon whether, and to what extent, the First Amendment protects certain efforts by Nike to respond—efforts that took the form of written communications in which Nike explained or denied many of the charges made.

The case arises under provisions of California law that authorize a private individual, acting as a "private attorney general," effectively to prosecute a business for unfair competition or false advertising. Cal. Bus. & Prof. Code Ann. §§ 17200, 17204, 17500, 17535 (West 1997). The respondent, Marc Kasky, has claimed that Nike made false or misleading commercial statements. And he bases this claim upon statements that Nike made in nine specific documents, including press releases and letters to the editor of a newspaper, to institutional customers, and to representatives of nongovernmental organizations. Brief for Respondent 5.

The California Court of Appeal affirmed dismissal of Kasky's complaint without leave to amend on the ground that

"the record discloses noncommercial speech, addressed to a topic of public interest and responding to public criticism of Nike's labor practices." App. to Pet. for Cert. 78a. The Court of Appeal added that it saw "no merit to [Kasky's] scattershot argument that he might still be able to state a cause of action on some theory allowing content-related abridgement of noncommercial speech." *Id.*, at 79a.

Kasky appealed to the California Supreme Court. He focused on the commercial nature of the communications at issue, while pointing to language in this Court's cases stating that the First Amendment, while offering protection to truthful commercial speech, does not protect false or misleading commercial speech, see *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 563 (1980). Kasky did not challenge the lower courts' denial of leave to amend his complaint. He also conceded that, if Nike's statements fell outside the category of "commercial speech," the First Amendment protected them and "the ultimate issue is resolved in Nike's favor." Appellant's Brief on the Merits in No. S087859 (Cal.), p. 1; accord, Appellant's Reply Brief in No. S087859 (Cal.), pp. 1–2.

The California Supreme Court held that the speech at issue falls within the category of "commercial speech." Consequently, the California Supreme Court concluded, the First Amendment does not protect Nike's statements insofar as they were false or misleading—regardless of whatever role they played in a public debate. 27 Cal. 4th 939, 946, 969, 45 P. 3d 243, 247, 262 (2002). Hence, according to the California Supreme Court, the First Amendment does not bar Kasky's lawsuit—a lawsuit that alleges false advertising and related unfair competition (which, for ease of exposition, I shall henceforth use the words "false advertising" to describe). The basic issue presented here is whether the California Supreme Court's ultimate holding is legally correct. Does the First Amendment permit Kasky's false advertising "prosecution" to go forward?

After receiving 34 briefs on the merits (including 31 *amicus* briefs) and hearing oral argument, the Court dismisses the writ of certiorari, thereby refusing to decide the questions presented, at least for now. In my view, however, the questions presented directly concern the freedom of Americans to speak about public matters in public debate, no jurisdictional rule prevents us from deciding those questions now, and delay itself may inhibit the exercise of constitutionally protected rights of free speech without making the issue significantly easier to decide later on. Under similar circumstances, the Court has found that failure to review an interlocutory order entails "an inexcusable delay of the benefits [of appeal] Congress intended to grant." *Mills* v. *Alabama*, 384 U. S. 214, 217 (1966). I believe delay would be similarly wrong here. I would decide the questions presented, as we initially intended.

I

Article III's "case or controversy" requirement does not bar us from hearing this case. Article III requires a litigant to have "standing"—*i. e.*, to show that he has suffered "injury in fact," that the injury is "fairly traceable" to actions of the opposing party, and that a favorable decision will likely redress the harm. *Bennett* v. *Spear*, 520 U. S. 154, 162 (1997) (internal quotation marks omitted). Kasky, the state-court plaintiff in this case, might indeed have had trouble meeting those requirements, for Kasky's complaint specifically states that Nike's statements did not harm Kasky personally. Lodging of Petitioners 4–5 (¶ 8). But Nike, the state-court defendant—not Kasky, the plaintiff—has brought the case to this Court. And Nike has standing to complain here of Kasky's actions.

These actions threaten Nike with "injury in fact." As a "private attorney general," Kasky is in effect enforcing a state law that threatens to discourage Nike's speech. See Cal. Bus. & Prof. Code Ann. §§ 17204, 17535 (West 1997). This Court has often found that the enforcement of such a

law works constitutional injury even if enforcement proceedings are not complete—indeed, even if enforcement is no more than a future threat. See, *e. g., Houston* v. *Hill,* 482 U. S. 451, 459, n. 7 (1987) (standing where there is "'a genuine threat of enforcement'" against future speech); *Steffel* v. *Thompson,* 415 U. S. 452, 459 (1974) (same). Cf. *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 785, n. 21 (1978) (The "burden and expense of litigating [an] issue" itself can "unduly impinge on the exercise of the constitutional right"); *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 52–53 (1971) (plurality opinion) ("The very possibility of having to engage in litigation, an expensive and protracted process, is threat enough"). And a threat of a civil action, like the threat of a criminal action, can chill speech. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 278 (1964) ("Plainly the Alabama law of civil libel is 'a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law'").

Here, of course, an action to enforce California's laws—laws that discourage certain kinds of speech—amounts to more than just a genuine, future threat. It is a present reality—one that discourages Nike from engaging in speech. It thereby creates "injury in fact." *Supra,* at 667. Further, that injury is directly "traceable" to Kasky's pursuit of this lawsuit. And this Court's decision, if favorable to Nike, can "redress" that injury. *Ibid.*

Since Nike, not Kasky, now seeks to bring this case to federal court, why should Kasky's standing problems make a critical difference? In *ASARCO Inc.* v. *Kadish,* 490 U. S. 605, 618 (1989), this Court specified that a defendant *with* standing may complain of an adverse state-court judgment, even if the *other* party—the party who brought the suit in state court and obtained that judgment—would have lacked standing to bring a case in federal court. See also *Virginia* v. *Hicks, ante,* at 120–121.

In *ASARCO*, state taxpayers (who ordinarily lack federal "standing") sued a state agency in state court, seeking a judgment declaring that the State's mineral leasing procedures violated federal law. See 490 U. S., at 610. ASARCO and other mineral leaseholders intervened as defendants. *Ibid.* The plaintiff taxpayers obtained a state-court judgment declaring that the State's mineral leasing procedures violated federal law. The defendant mineral leaseholders asked this Court to review the judgment. And this Court held that the leaseholders had standing to seek reversal of that judgment here.

The Court wrote:

> "When a state court has issued a judgment in a case where plaintiffs in the original action had no standing to sue under the principles governing the federal courts, we may exercise our jurisdiction on certiorari [1] if the judgment of the state court causes direct, specific, and concrete injury to the parties who petition for our review, where [2] the requisites of a case or controversy are also met." *Id.*, at 623–624 (bracketed numbers added).

No one denies that "requisites of a case or controversy" other than standing are met here. But is there "direct, specific, and concrete injury"?

In *ASARCO* itself, such "injury" consisted of the threat, arising out of the state court's determination, that the defendants' leases *might* later be canceled (if, say, a third party challenged those leases in later proceedings and showed they were not "made for 'true value'"). *Id.*, at 611–612, 618. Here that "injury" consists of the threat, arising out of the state court's determination, that defendant Nike's speech on public matters might be "chilled" immediately and legally restrained in the future. See *supra*, at 668. Where is the meaningful difference?

I concede that the state-court determination in *ASARCO* was more "final" in the sense that it unambiguously ordered a declaratory judgment, see 490 U. S., at 611–612 (finding that two exceptions to normal finality requirements applied), while the state-court determination here, where such declaratory relief was not sought, takes the form of a more intrinsically interlocutory holding, see *ante*, at 662, and n. 4 (STEVENS, J., concurring). But with respect to "standing," what possible difference could that circumstance make? The state court in *ASARCO* finally resolved federal questions related to state leasehold procedures; the state court here finally resolved the basic free speech issue—deciding that Nike's statements constituted "commercial speech" which, when "false or misleading," the government "may entirely prohibit," 27 Cal. 4th, at 946, 45 P. 3d, at 247. After answering the basic threshold question, the state court in *ASARCO* left other, more specific questions for resolution in further potential or pending proceedings, 490 U. S., at 611–612. The state court here did the same.

In *ASARCO*, the relevant further proceedings might have taken place in a new lawsuit; here they would have taken place in the same lawsuit. But that difference has little bearing on the likelihood of injury. Indeed, given the nature of the speech-chilling injury here and the fact that it is likely to occur immediately, I should think that constitutional standing in this case would flow from standing in *ASARCO* *a fortiori*.

## II

No federal statute prevents us from hearing this case. The relevant statute limits our jurisdiction to *"[f]inal judgments or decrees* rendered by the highest court of a State in which a decision could be had."  28 U. S. C. § 1257(a) (emphasis added). But the California Supreme Court determination before us, while technically an interim decision, is a "final judgment or decree" for purposes of this statute.

That is because this Court has interpreted the statute's phrase "final judgment" to refer, in certain circumstances, to a state court's final determination of a federal issue, even if the determination of that issue occurs in the midst of ongoing litigation. *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 477 (1975). In doing so, the Court has said that it thereby takes a *"pragmatic* approach," not a "mechanical" approach, to "determining finality." *Id.*, at 477, 486 (emphasis added). And it has set forth several criteria that determine when an interim state-court judgment is "final" for purposes of the statute, thereby permitting our consideration of the federal matter at issue.

The four criteria relevant here are those determining whether a decision falls within what is known as *Cox's* "fourth category" or "fourth exception." They consist of the following:

(1) "the federal issue has been finally decided in the state courts";

(2) in further pending proceedings, "the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court";

(3) "reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action rather than merely controlling the nature and character of, or determining the admissibility of evidence in, the state proceedings still to come"; and

(4) "a refusal immediately to review the state-court decision might seriously erode federal policy." *Id.*, at 482–483.

Each of these four conditions is satisfied in this case.

## A

Viewed from *Cox's* "pragmatic" perspective, "the federal issue has been finally decided in the state courts." *Id.*, at

482, 486. The California Supreme Court considered nine specific instances of Nike's communications—those upon which Kasky says he based his legal claims. Brief for Respondent 5. These include (1) a letter from Nike's Director of Sports Marketing to university presidents and athletic directors presenting "facts" about Nike's labor practices; (2) a 30-page illustrated pamphlet about those practices; (3) a press release (posted on Nike's Web site) commenting on those practices; (4) a posting on Nike's Web site about its "code of conduct"; (5) a document on Nike's letterhead sharing its "perspective" on the labor controversy; (6) a press release responding to "[s]weatshop [a]llegations"; (7) a letter from Nike's Director of Labor Practices to the Chief Executive Officer of YWCA of America, discussing criticisms of its labor practices; (8) a letter from Nike's European public relations manager to a representative of International Restructuring Education Network Europe, discussing Nike's practices; and (9) a letter to the editor of The New York Times taking issue with a columnist's criticisms of Nike's practices. *Ibid.;* see also Lodging of Petitioners 121–125, 182–191, 198–230, 270, 285, 322–324. The California Supreme Court then held that all this speech was "commercial speech" and consequently the "governmen[t] may entirely prohibit" that speech if it is "false or misleading." 27 Cal. 4th, at 946, 45 P. 3d, at 247.

The California Supreme Court thus "finally decided" the federal issue—whether the First Amendment protects the speech in question from legal attack on the ground that it is "false or misleading." According to the California Supreme Court, nothing at all remains to be decided with respect to *that* federal question. If we permit the California Supreme Court's decision to stand, in all likelihood this litigation will now simply seek to determine whether Nike's statements were false or misleading, and perhaps whether Nike was negligent in making those statements—matters involving questions of California law.

I concede that some other, possibly related federal constitutional issue *might* arise upon remand for trial. But some such likelihood is always present in ongoing litigation, particularly where, as in past First Amendment cases, this Court reviews interim state-court decisions regarding, for example, requests for a temporary injunction or a stay pending appeal, or (as here) denial of a motion to dismiss a complaint. *E. g., National Socialist Party of America* v. *Skokie,* 432 U. S. 43 (1977) *(per curiam)* (denial of a stay pending appeal); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971) (temporary injunction); *Mills* v. *Alabama,* 384 U. S. 214 (1966) (motion to dismiss).

Some such likelihood was present in *Cox* itself. The *Cox* plaintiff, the father of a rape victim, sued a newspaper in state court, asserting a right to damages under state law, which forbade publication of a rape victim's name. The trial court, believing that the statute imposed strict liability on the newspaper, granted summary judgment in favor of the victim. See *Cox Broadcasting Corp.* v. *Cohn,* 231 Ga. 60, 64, 200 S. E. 2d 127, 131 (1973), rev'd, 420 U. S. 469 (1975). The State Supreme Court affirmed in part and reversed in part. That court agreed with the plaintiff that state law provided a cause of action and that the cause of action was consistent with the First Amendment. 231 Ga., at 64, 200 S. E. 2d, at 131. However, the State Supreme Court disagreed about the standard of liability. Rather than strict liability, the standard, it suggested, was one of "wilful or negligent disregard for the fact that reasonable men would find the invasion highly offensive." *Ibid.* And it remanded the case for trial. The likelihood that further proceedings would address federal constitutional issues—concerning the relation between, for instance, the nature of the privacy invasion, the defendants' state of mind, and the First Amendment— would seem to have been far higher there than in any further proceedings here. Despite that likelihood, and because the State Supreme Court held in effect that the First Amend-

ment did not protect the speech at issue, this Court held that its determination of *that* constitutional question was "plainly final." *Cox,* 420 U. S., at 485. California's Supreme Court has made a similar holding, and its determination of the federal issue is similarly "final."

## B

The second condition specifies that, in further proceedings, the "party seeking review here"—*i. e.,* Nike—"might prevail on the merits on nonfederal grounds." *Id.,* at 482. If Nike shows at trial that its statements are neither false nor misleading, nor otherwise "unfair" under California law, Cal. Bus. & Prof. Code Ann. §§ 17200, 17500 (West 1997), it will show that those statements did not constitute unfair competition or false advertising under California law—a nonfederal ground. And it will "prevail on the merits on nonfederal grounds," *Cox,* 420 U. S., at 482. The second condition is satisfied.

## C

The third condition requires that "reversal of the state court on the federal issue . . . be preclusive of any further litigation on the relevant cause of action." *Id.,* at 482–483. Taken literally, this condition is satisfied. An outright reversal of the California Supreme Court would reinstate the judgment of the California intermediate court, which affirmed dismissal of the complaint without leave to amend. *Supra,* at 665–666. It would forbid Kasky to proceed insofar as Kasky's state-law claims focus on the nine documents previously discussed. And Kasky has conceded that his claims rest on statements made in those documents. Brief for Respondent 5.

I concede that this Court might not reverse the California Supreme Court outright. It might take some middle ground, neither affirming nor fully reversing, that permits this litigation to continue. See *ante,* at 659–660 (STEVENS, J., concurring). But why is that possibility relevant? The

third condition specifies that *"reversal"*—not some *other* disposition—will preclude "further litigation."

The significance of this point is made clear by our prior cases. In *Cox*, this Court found jurisdiction despite the fact that it *might* have chosen a middle First Amendment ground—perhaps, for example, precluding liability (for publication of a rape victim's name) where based on negligence, but not where based on malice. And such an intermediate ground, while producing a judgment that the State Supreme Court decision was erroneous, would have permitted the litigation to go forward. Cf. Brief for Appellants in *Cox Broadcasting Corp.* v. *Cohn*, O. T. 1973, No. 73–938, p. 68, n. 127 (arguing that " 'summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection' "). Similarly in *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974), the Court might have held that the Constitution permits a State to require a newspaper to carry a candidate's reply to an editorial—but only *in certain circumstances*—thereby potentially leaving a factual issue whether those circumstances applied. Cf. Brief for Appellant in *Miami Herald Publishing Co.* v. *Tornillo*, O. T. 1973, No. 73–797, pp. 26–27, and n. 60 (noting that the State Supreme Court based its decision in part on a conclusion, unsupported by record evidence, that control of mass media had become substantially concentrated). One can imagine similar intermediate possibilities in virtually every case in which the Court has found this condition satisfied, including those involving technical questions of statutory jurisdiction and venue, cf. *ante*, at 659 (STEVENS, J., concurring).

Conceivably, one might argue that the third condition is *not* satisfied here despite literal compliance, see *supra*, at 674 and this page, on the ground that, from a pragmatic perspective, outright reversal is not a very realistic possibility. But that proposition simply is not so. In my view, the probabilities are precisely the contrary, and a true reversal is a highly realistic possibility.

To understand how I reach this conclusion, the reader must recall the nature of the holding under review. The California Supreme Court held that certain specific communications, exemplified by the nine documents upon which Kasky rests his case, fall within that aspect of the Court's commercial speech doctrine that says the First Amendment protects only *truthful* commercial speech; hence, to the extent commercial speech is false or misleading, it is unprotected. See *supra*, at 666.

The Court, however, has added, in commercial speech cases, that the First Amendment " 'embraces at the least the liberty to discuss publicly and truthfully all matters of public concern.'" *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 534 (1980); accord, *Central Hudson*, 447 U. S., at 562–563, n. 5. And in other contexts the Court has held that speech on matters of public concern needs " 'breathing space' "—potentially incorporating certain false or misleading speech—in order to survive. *New York Times*, 376 U. S., at 272; see also, *e. g.*, *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974); *Time, Inc.* v. *Hill*, 385 U. S. 374, 388–389 (1967).

This case requires us to reconcile these potentially conflicting principles. In my view, a proper resolution here favors application of the last mentioned public-speech principle, rather than the first mentioned commercial-speech principle. Consequently, I would apply a form of heightened scrutiny to the speech regulations in question, and I believe that those regulations cannot survive that scrutiny.

First, the communications at issue are not purely commercial in nature. They are better characterized as involving a mixture of commercial and noncommercial (public-issue-oriented) elements. The document *least* likely to warrant protection—a letter written by Nike to university presidents and athletic directors—has several commercial characteristics. See Appendix, *infra* (reproducing pages 190 and 191 of Lodging of Petitioners). As the California Supreme Court

implicitly found, 27 Cal. 4th, at 946, 45 P. 3d, at 247, it was written by a "commercial speaker" (Nike), it is addressed to a "commercial audience" (potential institutional buyers or contractees), and it makes "representations of fact about the speaker's own business operations" (labor conditions). *Ibid.* See, *e. g., Bolger* v. *Youngs Drug Products Corp.,* 463 U. S. 60, 66–67 (1983).

But that letter also has other critically important and, I believe, predominant noncommercial characteristics with which the commercial characteristics are "inextricably intertwined." *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 796 (1988). For one thing, the letter appears outside a traditional advertising format, such as a brief television or newspaper advertisement. It does not propose the presentation or sale of a product or any other commercial transaction, *United States* v. *United Foods, Inc.,* 533 U. S. 405, 409 (2001) (describing this as the "usua[l]" definition for commercial speech). Rather, the letter suggests that its contents might provide "information useful in discussions" with concerned faculty and students. Lodging of Petitioners 190. On its face, it seeks to convey information to "a diverse audience," including individuals who have "a general curiosity about, or genuine interest in," the public controversy surrounding Nike, *Bigelow* v. *Virginia,* 421 U. S. 809, 822 (1975).

For another thing, the letter's content makes clear that, in context, it concerns a matter that is of significant public interest and active controversy, and it describes factual matters related to that subject in detail. In particular, the letter describes Nike's labor practices and responds to criticism of those practices, and it does so because those practices themselves play an important role in an existing public debate. This debate was one in which participants advocated, or opposed, public collective action. See, *e. g.,* Lodging of Petitioners 143 (article on student protests), 232–236 (fact sheet with "Boycott Nike" heading). See generally *Roth* v.

*United States*, 354 U. S. 476, 484 (1957) (The First Amendment's protections of speech and press were "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes"). That the letter is factual in content does not argue against First Amendment protection, for facts, sometimes facts alone, will sway our views on issues of public policy.

These circumstances of form and content distinguish the speech at issue here from the more purely "commercial speech" described in prior cases. See, *e. g., United Foods, supra,* at 409 (commercial speech "usually defined as speech that does *no more than* propose a commercial transaction" (emphasis added)); *Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469, 473–474 (1989) (describing this as "the test"); *Central Hudson,* 447 U. S., at 561 (commercial speech defined as "expression related *solely* to the economic interests of the speaker and its audience" (emphasis added)). The speech here is unlike speech—say, the words "dolphin-safe tuna"—that commonly appears in more traditional advertising or labeling contexts. And it is unlike instances of speech where a communication's contribution to public debate is peripheral, not central, cf. *id.,* at 562–563, n. 5.

At the same time, the regulatory regime at issue here differs from traditional speech regulation in its use of private attorneys general authorized to impose "false advertising" liability even though they themselves have suffered no harm. See Cal. Bus. & Prof. Code Ann. §§ 17204, 17535 (West 1997). In this respect, the regulatory context is unlike most traditional false advertising regulation. And the "false advertising" context differs from other regulatory contexts—say, securities regulation—where a different balance of concerns calls for different applications of First Amendment principles. Cf. *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 456–457 (1978).

These three sets of circumstances taken together—circumstances of format, content, and regulatory context—warrant

treating the regulations of speech at issue differently from regulations of purer forms of commercial speech, such as simple product advertisements, that we have reviewed in the past. And, where all three are present, I believe the First Amendment demands heightened scrutiny.

Second, I doubt that this particular instance of regulation (through use of private attorneys general) can survive heightened scrutiny, for there is no reasonable "fit" between the burden it imposes upon speech and the important governmental "'interest served,'" *Fox, supra,* at 480. Rather, the burden imposed is disproportionate.

I do not deny that California's system of false advertising regulation—including its provision for private causes of action—furthers legitimate, traditional, and important public objectives. It helps to maintain an honest commercial marketplace. It thereby helps that marketplace better allocate private goods and services. See *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 765 (1976). It also helps citizens form "intelligent opinions as to how [the marketplace] ought to be regulated or altered." *Ibid.*

But a private "false advertising" action brought on behalf of the State, by one who has suffered no injury, threatens to impose a serious burden upon speech—at least if extended to encompass the type of speech at issue under the standards of liability that California law provides, see Cal. Bus. & Prof. Code Ann. §§ 17200, 17500 (West 1997) (establishing regimes of strict liability, as well as liability for negligence); *Cortez* v. *Purolator Air Filtration Products Co.,* 23 Cal. 4th 163, 181, 999 P. 2d 706, 717 (2000) (stating that California's unfair competition law imposes strict liability). The delegation of state authority to private individuals authorizes a purely ideological plaintiff, convinced that his opponent is not telling the truth, to bring into the courtroom the kind of political battle better waged in other forums. Where that political battle is hard fought, such plaintiffs potentially constitute

a large and hostile crowd freely able to bring prosecutions designed to vindicate their beliefs, and to do so unencumbered by the legal and practical checks that tend to keep the energies of public enforcement agencies focused upon more purely economic harm. Cf. *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123, 134–135 (1992); *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 67–71 (1963).

That threat means a commercial speaker must take particular care—considerably more care than the speaker's noncommercial opponents—when speaking on public matters. A large organization's unqualified claim about the adequacy of working conditions, for example, could lead to liability, should a court conclude after hearing the evidence that enough exceptions exist to warrant qualification—even if those exceptions were unknown (but perhaps should have been known) to the speaker. Uncertainty about how a court will view these, or other, statements, can easily chill a speaker's efforts to engage in public debate—particularly where a "false advertising" law, like California's law, imposes liability based upon negligence or without fault. See *Gertz*, 418 U. S., at 340; *Time*, 385 U. S., at 389. At the least, they create concern that the commercial speaker engaging in public debate suffers a handicap that noncommercial opponents do not. See *First Nat. Bank*, 435 U. S., at 785–786; see also *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828 (1995).

At the same time, it is difficult to see why California needs to permit such actions by private attorneys general—at least with respect to speech that is not "core" commercial speech but is entwined with, and directed toward, a more general public debate. The Federal Government regulates unfair competition and false advertising in the absence of such suits. 15 U. S. C. § 41 *et seq.* As far as I can tell, California's delegation of the government's enforcement authority to private individuals is not traditional, and may be unique, Tr. of Oral Arg. 42. I do not see how "false advertising"

regulation could suffer serious impediment if the Constitution limited the scope of private attorney general actions to circumstances where more purely commercial and less public-debate-oriented elements predominate. As the historical treatment of speech in the labor context shows, substantial government regulation can coexist with First Amendment protections designed to provide room for public debate. Compare, *e. g.*, *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 616–620 (1969) (upholding prohibition of employer comments on unionism containing threats or promises), with *Thomas* v. *Collins*, 323 U. S. 516, 531–532 (1945); *Thornhill* v. *Alabama*, 310 U. S. 88, 102 (1940).

These reasons convince me that it is likely, if not highly probable, that, if this Court were to reach the merits, it would hold that heightened scrutiny applies; that, under the circumstances here, California's delegation of enforcement authority to private attorneys general disproportionately burdens speech; and that the First Amendment consequently forbids it.

Returning to the procedural point at issue, I believe this discussion of the merits shows that not only will "reversal" of the California Supreme Court "on the federal issue" prove "preclusive of any further litigation on the relevant cause of action," *Cox*, 420 U. S., at 482–483, but also such "reversal" is a serious possibility. Whether we take the words of the third condition literally or consider the circumstances pragmatically, that condition is satisfied.

### D

The fourth condition is that "a refusal immediately to review the state-court decision might seriously erode federal policy." *Id.*, at 483. This condition is met because refusal immediately to review the state-court decision before us will "seriously erode" the federal constitutional policy in favor of free speech.

If permitted to stand, the state court's decision may well "chill" the exercise of free speech rights. See *id.*, at 486; *Fort Wayne Books, Inc.* v. *Indiana*, 489 U. S. 46, 56 (1989). Continuation of this lawsuit itself means increased expense, and, if Nike loses, the results may include monetary liability (for "restitution") and injunctive relief (including possible corrective "counterspeech"). See, *e. g., Cel-Tech Communications, Inc.* v. *Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163, 179, 973 P. 2d 527, 539 (1999); *Consumers Union of U. S., Inc.* v. *Alta-Dena Certified Dairy*, 4 Cal. App. 4th 963, 971–972, 6 Cal. Rptr. 2d 193, 197–198 (1992). The range of communications subject to such liability is broad; in this case, it includes a letter to the editor of The New York Times. The upshot is that commercial speakers doing business in California may hesitate to issue significant communications relevant to public debate because they fear potential lawsuits and legal liability. Cf. *Gertz, supra,* at 340 (warning that overly stringent liability for false or misleading speech can "lead to intolerable self-censorship"); *Time, supra,* at 389 ("Fear of large verdicts in damage suits for innocent or merely negligent misstatement, even fear of the expense involved in their defense, must inevitably cause publishers to 'steer . . . wider of the unlawful zone' ").

This concern is not purely theoretical. Nike says without contradiction that because of this lawsuit it has decided "to restrict severely all of its communications on social issues that could reach California consumers, including speech in national and international media." Brief for Petitioners 39. It adds that it has not released its annual Corporate Responsibility Report, has decided not to pursue a listing in the Dow Jones Sustainability Index, and has refused "dozens of invitations . . . to speak on corporate responsibility issues." *Ibid.* Numerous *amici*—including some who do not believe that Nike has fully and accurately explained its labor practices—argue that California's decision will "chill" speech and

thereby limit the supply of relevant information available to those, such as journalists, who seek to keep the public informed about important public issues. Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 2–3; Brief for Chamber of Commerce of the United States of America as *Amicus Curiae* 10–12; Brief for ABC Inc. et al. as *Amici Curiae* 6–13; Brief for Pfizer Inc. as *Amicus Curiae* 10–14.

In sum, all four conditions are satisfied here. See *supra,* at 671. Hence, the California Supreme Court's judgment falls within the scope of the term "final" as it appears in 28 U. S. C. § 1257(a), and no statute prevents us from deciding this case.

### III

There is no strong prudential argument against deciding the questions presented. Compare *ante,* at 663–664 (STEVENS, J., concurring), with *Ashwander* v. *TVA,* 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring). These constitutional questions are not easy ones, for they implicate both free speech and important forms of public regulation. But they arrive at the threshold of this case, asking whether the Constitution permits this private attorney general's lawsuit to go forward on the basis of the pleadings at hand. This threshold issue was vigorously contested and decided, adverse to Nike, below. Cf. *Yee* v. *Escondido,* 503 U. S. 519, 534–535 (1992). And further development of the record seems unlikely to make the questions presented any easier to decide later.

At the same time, waiting extracts a heavy First Amendment price. If this suit goes forward, both Nike and other potential speakers, out of reasonable caution or even an excess of caution, may censor their own expression well beyond what the law may constitutionally demand. See *Time,* 385 U. S., at 389; *Gertz,* 418 U. S., at 340. That is what a "chilling effect" means. It is present here.

## IV

In sum, I can find no good reason for postponing a decision in this case. And given the importance of the First Amendment concerns at stake, there are strong reasons not to do so. The position of at least one *amicus*—opposed to Nike on the merits of its labor practice claims but supporting Nike on its free speech claim—echoes a famous sentiment reflected in the writings of Voltaire: 'I do not agree with what you say, but I will fight to the end so that you may say it.' See Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 3. A case that implicates that principle is a case that we should decide.

I would not dismiss as improvidently granted the writ issued in this case. I respectfully dissent from the Court's contrary determination.

## APPENDIX TO OPINION OF BREYER, J.

What follows is a copy of the letter to university presidents and athletic directors at issue in this case, Lodging of Petitioners 190–191:

June 18, 1996

Dear President and Director of Athletics,

As most of you have probably read, heard or seen, NIKE, Inc. has recently come under attack from the Made in the USA Foundation, and other labor organizers, who claim that child labor is used in the production of its goods. While you may also be aware that NIKE has gone on the record to categorically deny these allegations as completely false and irresponsible, I would like to extend the courtesy of providing you with many of the facts that have been absent from the media discourse on this issue. I hope you will find this information useful in discussions with faculty and students who may be equally disturbed by these charges.

First and foremost, wherever NIKE operates around the globe, it is guided by principles set forth in a code of conduct that binds its production subcontractors to a signed Memorandum of Understanding. This Memorandum strictly prohibits child labor, and certifies compliance with applicable government regulations regarding minimum wage and overtime, as well as occupational health and safety, environmental regulations, worker insurance and equal opportunity provisions.

NIKE enforces its standards through daily observation by staff members who are responsible for monitoring adherence to the Memorandum. NIKE currently employs approximately 800 staff members in Asia alone to oversee operations. Every NIKE subcontractor knows that the enforcement of the Memorandum includes systematic, unannounced evaluation by third-party auditors. These thorough reviews include interviews with workers; examination of safety equipment and procedures, review of free health-care facilities, investigation of worker grievances and audits of payroll records.

Furthermore, over the past 20 years we have established long-term relationships with select subcontractors, and we believe that our sense of corporate responsibility has influenced the way they conduct their business. After all, it is incumbent upon leaders like NIKE to ensure that these violations do not occur in our subcontractor's factories.

NIKE, INC. ONE BOWERMAN DRIVE, BEAVERTON, OR 97005-6453 TEL:503-671-6453 FAX:503-671-6130

686

We have found over the years that, given the vast area of our operations and the difficulty of policing such a network, some violations occur. However, we have been proud that in all material respects the code of conduct is complied with. The code is not just word. We live by it. NIKE is proud of its contribution in helping to build economies, provide skills, and create a brighter future for millions of workers around the world.

As a former Director of Athletics, and currently the Director of Sports Marketing at NIKE, I am indeed sensitive to these issues. I would be more than happy to make myself available to either discuss the issues and/or receive any opinions or insights you may have. We are committed to the world of sports and all that it stands for. I remain at your disposal.

Kindest regards,

Steve Miller
Director
NIKE Sports Marketing

SM:en

cc: Philip H. Knight
Donna Gibbs
Kit Morris
Erin Patton