# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WALBER LEONEL,
    *Plaintiff-Appellant,*

    v.

AMERICAN AIRLINES, INC.,
    *Defendant-Appellee.*

No. 03-15890

D.C. No.
CV-00-03842-PJH

RICHARD BRANTON,
    *Plaintiff-Appellant,*

    v.

AMERICAN AIRLINES, INC.,
    *Defendant-Appellee.*

No. 03-15893

D.C. No.
CV-00-02597-PJH

VINCENT FUSCO,
    *Plaintiff-Appellant,*

    v.

AMERICAN AIRLINES, INC.,
    *Defendant-Appellee.*

No. 03-15897

D.C. No.
CV-00-01439-PJH

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
PANEL
REHEARING AND
PETITION FOR
REHEARING
EN BANC AND
AMENDED
OPINION

4685

Appeals from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
October 4, 2004—San Francisco, California

Filed March 4, 2005
Amended April 28, 2005

Before: Richard D. Cudahy,* Susan P. Graber and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

---

*The Honorable Richard D. Cudahy, Senior Judge, United States Court
of Appeals for the Seventh Circuit, sitting by designation.

**COUNSEL**

Todd M. Schneider, Guy B. Wallace and Wendy E. Musell, Schneider & Wallace, San Francisco, California, and Kathleen McCormac, McCormac & Associates, San Francisco, California, for the plaintiffs-appellants.

Paula Champagne, Littler Mendelson, P.C., San Francisco, California, and Kenneth R. O'Brien and Dylan W. Wiseman, Littler Mendelson, Sacramento, California, for the defendant-appellee.

Claudia Center, The Legal Aid Society-Employment Law Center, San Francisco, California, for the amicus curiae.

## ORDER

The opinion filed on March 4, 2005, slip op. 2583, 400 F.3d 702 (9th Cir. 2005), is amended as follows:

At slip op. 2596, line 9, insert a new footnote at the end of the last sentence after "VI-4.":

> [13] We do not suggest that, when a medical examination is conducted at the proper time and in the proper manner, an applicant has an option to lie, or that an employer is foreclosed from refusing to hire an applicant who does.

With this amendment, the panel judges have voted to deny appellee's petition for panel rehearing. Judges Graber and Fisher have voted to deny the petition for rehearing en banc, and Judge Cudahy so recommends.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and petition for rehearing en banc, filed March 25, 2005, is **DENIED**.

No further petitions for rehearing or petitions for rehearing en banc will be considered.

---

## OPINION

FISHER, Circuit Judge:

Appellants Walber Leonel, Richard Branton and Vincent Fusco, who all have the human immunodeficiency virus ("HIV"), applied for flight attendant positions with American

Airlines ("American"). Although they went through the application process at different times, the process was essentially the same for all of them. American interviewed them at its Dallas, Texas, headquarters and then issued them conditional offers of employment, contingent upon passing both background checks and medical examinations. Rather than wait for the background checks, American immediately sent the appellants to its on-site medical department for medical examinations, where they were required to fill out medical history questionnaires and give blood samples. None of them disclosed his HIV-positive status or related medications. Thereafter, alerted by the appellants' blood test results, American discovered their HIV-positive status and rescinded their job offers, citing their failure to disclose information during their medical examinations.

The appellants, all California residents, now challenge American's medical inquiries and examinations as prohibited by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (1999), and California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et seq.* (1999). They argue that American could not require them to disclose their personal medical information so early in the application process — before the company had completed its background checks such that the medical examination would be the only remaining contingency — and thus their nondisclosures could not be used to disqualify them. They further contend that American violated their rights to privacy under the California Constitution by conducting complete blood count tests ("CBC"s) on their blood samples without notifying them or obtaining their consent.

The district court had diversity jurisdiction over the appellants' individual suits; it consolidated the actions and granted American's motion for summary judgment on all claims. We have jurisdiction over the consolidated appeals under 28 U.S.C. § 1291. We hold that the appellants have raised mate-

rial issues of fact as to all appealed claims except Fusco's claim of intentional infliction of emotional distress.

## I.

Leonel, Branton and Fusco all participated in American's standard application process for flight attendant positions. They first responded to questions in telephone surveys and then provided more extensive information about their language abilities, previous employment and educational backgrounds in written applications.[1] Based on these initial screening forms, American selected the appellants to fly to the company's headquarters in Dallas, Texas, for in-person interviews.

Leonel, Branton and Fusco flew to Dallas at American's expense on March 25, 1998, June 25, 1998 and May 27, 1999, respectively. There, they participated first in group interviews, and then, having been chosen to progress in the application process, in individual interviews. Immediately after these interviews, members of the American Airlines Flight Attendant Recruitment Team extended the appellants conditional offers of employment. Written letters that accompanied the oral offers read:

> At this point in our recruiting process, I am pleased to make you a conditional offer of employment as a flight attendant with American Airlines. It is important, however, that you fully understand the conditions of this offer as they are detailed below. . . . Our offer is contingent upon your successful completion of a drug test, a medical examination, and a satisfactory background check . . . .[2]

---

[1] Among the terms specified on the written application, the appellants agreed to the following: "I understand I will be terminated if I provide false or fraudulent information on this application."

[2] Fusco's conditional offer letter, issued approximately one year after Leonel's and Branton's letters, used slightly different language: "We are

After making the offers, American Airlines representatives directed the appellants to go immediately to the company's medical department for medical examinations.

There, the appellants were instructed to fill out series of forms.[3] One, a "Notice and Acknowledgment of Drug Test," informed them that they would be asked to provide a urine specimen which would be tested for certain specified drugs, and solicited their written consent for the testing. This form also required them to list all medications they were taking at the time. None of the appellants listed the medications he was taking for HIV.

American also required the appellants to complete medical history forms that asked whether they had any of 56 listed medical conditions, including "blood disorder" (on Branton's and Leonel's forms) and "blood disorder or HIV/[AIDS]" (on Fusco's form). Here, too, none of the appellants disclosed his HIV-positive status. Fusco, who participated in the application process approximately 14 months after Branton and 11 months after Leonel, also had to sign an "Applicant Non-Disclosure Notice," which advised that during the examination he would be asked detailed and personal questions about his medical history and that it was important to disclose all conditions fully because of American's public safety responsibilities.[4] After completing the forms, the appellants met with

---

pleased to offer you the position of flight attendant. This conditional offer of employment is contingent upon your successful completion of a drug test and medical examination. Additionally, you will be subject to an employment history verification and a possible criminal history records check."

American also required the appellants to pass a drug test and comply with Department of Transportation drug and alcohol rules. Those requirements are not at issue here.

[3]The appellants testified that American's representatives did not explain at this or any later stage what the medical examination would entail.

[4]The Notice stated:

You are about to be asked some very detailed and personal ques-

nurses to discuss their medical histories. Again they said nothing about their HIV-positive status or relevant medications despite questions asking for that kind of information.

At some point during the appellants' medical examinations, nurses drew blood samples. Unlike the urinalysis procedure, American did not provide notice or obtain written consent for its blood tests. Nor did any of the company's representatives disclose that a complete blood count would be run on the blood samples.[5] When Fusco explicitly asked what his blood would be tested for, a nurse replied simply, "anemia."

A few days after the appellants' medical examinations, American's medical department ran CBC tests on their blood samples and discovered that they had elevated "mean corpuscular volumes" ("MCV"s). According to American's medical expert, Dr. McKenas, elevated MCV levels result from (1) alcoholism (approximately 26% of cases); (2) medications for HIV, seizure disorders, chemotherapy or transplants (approximately 38% of cases) and (3) sickle cell disease, bone marrow disorder, folate deficiency or liver disorder (approximately 36% of cases). The appellants' expert, Dr. Shelley Gordon,

---

tions about your medical history. It is very important that you be truthful and complete in your statements about your health. . . . Your actual medical condition — even if you think it is a minor one or one which you consider private — is relevant to the company's duty [of safety to the general public]. [The company does not discriminate against persons with disabilities and will adhere to the confidentiality requirements of the ADA.] However, if you falsify . . . any information about your health, it will be considered . . . grounds for non-hire . . . . If you do not provide complete information today, it will be considered a falsification.

[5]A CBC test is a comprehensive blood test used to measure the quantity, size and volume of blood cells. American's former Corporate Medical Director and Director of Integrated Health Management, Dr. David McKenas, explained that American "uses the CBC test to determine whether an applicant has a sufficient oxygen-carrying capacity to perform his duties in a high-altitude environment."

testified that approximately 99% of individuals with HIV have elevated MCV levels. As nothing in any of the appellants' medical histories indicated cause for an elevated MCV level, American wrote the appellants and requested explanations for the results. All of the appellants, acting through their personal physicians, then disclosed their HIV-positive status and medications.

After learning that the appellants had HIV, American's medical department sent forms to the company's recruiting department stating, as final dispositions, that the appellants "[did] not meet AA medical guidelines." The forms also specified the ground on which the appellants had failed to meet the medical guidelines as "nondisclosure." The recruiting department then wrote the appellants and rescinded their conditional offers of employment. The rescission letters stated:

> You received an offer of employment . . . conditioned upon your clearing our medical process and background check. Unfortunately, I have been informed by our Medical Department that you failed to be candid or provide full and correct information. Consequently, I am withdrawing our conditional offer of employment due to your inability to fulfill all conditions.
>
> . . . .
>
> Because American Airlines strictly adheres to the requirements of the [ADA], I have not been informed of your particular situation. American Airlines will consider for employment any qualified individual if they can safely perform the essential functions of the job . . . . However, the Company will not tolerate willful omissions of fact on its employment applications . . . .

Upon learning that their offers had been rescinded, the appellants brought individual suits against American. Fusco and Branton originally filed their respective claims in the California courts; American removed those cases to the United States District Court for the Northern District of California based on diversity jurisdiction. Leonel brought suit in the district court in the first instance. The district court dismissed Leonel's direct claims that the examinations violated FEHA and the ADA in June 2001.[6] It then consolidated the appellants' cases and, in April 2003, granted summary judgment for American on all claims.

The appellants appeal their claims brought under California's FEHA, right to privacy law, tort of intentional infliction of emotional distress and Unfair Competition Law ("UCL"), which provides an independent cause of action for business practices that violate other laws. Cal. Bus. & Prof. Code § 17200 *et seq.*; *see Kasky v. Nike, Inc.*, 45 P.3d 243, 249 (Cal. 2002), *cert. dismissed*, 123 S. Ct. 2554 (2003) (per curiam). Because the UCL and tort claims are predicated on the substantive law of FEHA, the ADA or the California Constitution, the questions before us are (1) whether American's medical examinations were lawful under the ADA[7] and FEHA[8] and (2) whether the CBC tests violated the appellants' rights to privacy as protected by the California Constitution.[9]

---

[6]Leonel has not appealed these claims.

[7]None of the appellants is making a direct ADA claim. The ADA remains central to our legal analysis, however, because FEHA — upon which all the appellants rely — incorporates the ADA, and because Leonel's UCL claim is predicated on a violation of the ADA.

[8]Branton and Fusco bring claims directly under FEHA, and all three appellants bring claims under the UCL predicated on FEHA.

[9]Fusco appeals summary judgment on his privacy claim and his intentional infliction of emotional distress claim based on the right to privacy. All three appellants appeal their UCL claims predicated on the right to privacy.

II.

We review de novo the district court's summary judgment order. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). We must determine "whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

III.

**[1]** The federal Americans with Disabilities Act and California's Fair Employment and Housing Act prohibit employers from refusing to hire job applicants whose disabilities would not prevent them from "perform[ing] the essential functions of the job with reasonable accommodation." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (per curiam). To this end, the ADA and FEHA not only bar intentional discrimination, they also regulate the *sequence* of employers' hiring processes. Both statutes prohibit medical examinations and inquiries until *after* the employer has made a "real" job offer to an applicant. *See* 42 U.S.C. § 12112(d) (1999);**[10]** Cal. Gov't Code § 12940(d) (1999).**[11]** "A job offer

---

**[10]**In 1998 and 1999, when the appellants applied for flight attendant positions with American, the ADA provided that an employer should "not conduct a medical examination or make inquiries of a job applicant as to whether [he had] a disability or as to the nature or severity of such disability" except that an employer could "require a medical examination after an offer of employment ha[d] been made to a job applicant and prior to the commencement of the employment duties of such applicant and [could] condition an offer of employment on the results of such examination." 42 U.S.C. § 12112(d)(3) (1999).

**[11]**FEHA includes this requirement through incorporation of the ADA. *See* Cal. Gov't Code § 12940(d) (1999) (stating that employers may make job-related medical inquiries "[e]xcept as provided in the [ADA] and the regulations adopted thereto"); *see also* 2 C.C.R. § 7294.0 (stating that it is unlawful to ask general questions on disability pre-employment but that

is real if the employer has evaluated all relevant non-medical information which it reasonably could have obtained and analyzed prior to giving the offer." Equal Employment Opportunity Commission, ADA Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations, 17 (1995) ("EEOC's ADA Enforcement Guidance").[12] To issue a "real" offer under the ADA and FEHA, therefore, an employer must have either completed all non-medical components of its application process or be able to demonstrate that it could not reasonably have done so before issuing the offer.

> The ADA recognizes that employers may need to conduct medical examinations to determine if an applicant can perform certain jobs effectively and safely. The ADA requires only that such examinations be conducted as a separate, second step of the selection process, after an individual has met all other job pre-requisites.

Equal Employment Opportunity Commission, Technical Assistance Manual on the Employment Provisions of the ADA, VI-4 (1992) ("EEOC's Technical Assistance Manual").

This two-step requirement serves in part to enable applicants to determine whether they were "rejected because of disability, or because of insufficient skills or experience or a bad report from a reference." EEOC's ADA Enforcement Guidance, 1. When employers rescind offers made condi-

___

employers may "condition an *offer* of employment on the results of a medical examination conducted prior to the employee's entrance on duty in order to determine fitness for the job in question"); Assembly Judiciary Committee, at 2-3 (Jan. 22, 1992) ("This bill . . . only permit[s] medical examinations after an offer of employment.")

[12]When interpreting the ADA, we look to the Equal Employment Opportunity Commission's interpretations for persuasive guidance. *See, e.g.*, *Harris v. Harris & Hart, Inc.*, 206 F.3d 838, 842 (9th Cir. 2000).

tional on both non-medical and medical contingencies, appli-cants cannot easily discern or challenge the grounds for rescission. When medical considerations are isolated, how-ever, applicants know when they have been denied employ-ment on medical grounds and can challenge an allegedly unlawful denial.

The two-step structure also protects applicants who wish to keep their personal medical information private. Many hidden medical conditions, like HIV, make individuals vulnerable to discrimination once revealed. The ADA and FEHA allow applicants to keep these conditions private until the last stage of the hiring process. Applicants may then choose whether or not to disclose their medical information once they have been assured that as long as they can perform the job's essential tasks, they will be hired. *See id.* at VI-3 - VI-4.[13]

**[2]** American's offers to the appellants here were by their terms contingent not just on the appellants successfully com-pleting the medical component of the hiring process but also on the completion of a critical *non-medical* component: undergoing background checks, including employment verifi-cation and criminal history checks.[14] Other courts have found offers not real, and medical examinations thus unlawfully pre-mature, when an offer remained contingent upon a polygraph test, personal interview and background investigation, *see Buchanan v. City of San Antonio*, 85 F.3d 196, 199 (5th Cir. 1996), or upon completion of an application form, criminal background check and driver's test. *See Downs v. Mass. Bay Transp. Auth.*, 13 F. Supp. 2d 130, 138 (D. Mass. 1998); *see*

---

[13]We do not suggest that, when a medical examination is conducted at the proper time and in the proper manner, an applicant has an option to lie, or that an employer is foreclosed from refusing to hire an applicant who does.

[14]The company's Manager of Flight Service Procedures, Julie Bourk-Suchman, testified that American also might rescind a conditional offer if a candidate were unruly on the plane ride home or had a visible tattoo.

*also O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002) (upholding medical inquiries made after the employer issued an offer contingent upon a series of medical inquiries, because "additional *medical* tests do not render the offer insufficient." (emphasis added)). Here, it is undisputed that American's offers were subject to both medical and non-medical conditions when they were made to the appellants and the appellants were required to undergo immediate medical examinations. Thus the offers were not real, the medical examination process was premature and American cannot penalize the appellants for failing to disclose their HIV-positive status — unless the company can establish that it could not reasonably have completed the background checks before subjecting the appellants to medical examinations and questioning. It has not done so.

As justification for accelerating the medical examinations, American's Manager of Flight Service Procedures, Julie Bourk-Suchman, explained that the company found it important to minimize the length of time that elapsed during the hiring process in order to compete for applicants. But competition in hiring is not in itself a reason to contravene the ADA's and FEHA's mandates to defer the medical component of the hiring process until the non-medical component is completed. The appellants' expert, Craig Pratt, a management consultant, testified that it is "the accepted practice for employers to complete such [background] checks *prior to* conducting a preemployment medical examination of the job applicant." American has not established that there are no reasonable alternatives that would address its asserted need for expedited hiring of flight attendants that would avoid jumping medical exams ahead of background checks. For instance, it has not shown why it could not expeditiously have issued two rounds of conditional offers — the first, after the interviews, informing applicants that they had reached the final stages of the application process and would be hired absent problems with their background checks or medical examinations; and the second, after completion of the background checks, ensur-

ing employment if the applicant passed the medical examination.

American also suggests that it conducted the medical examinations before completing the background checks for the convenience of the applicants. As Bourk-Suchman put it, "[i]t's not a business reason. It just has to do with the applicants and trying to have it be convenient for them." Not only does this testimony undercut American's meeting-competition rationale, applicants' supposed convenience does not justify reordering the hiring process in a manner contrary to that set out by the ADA and FEHA. Congress and the California legislature both have determined that job applicants should not be required to undergo medical examinations before they hold real offers of employment. American — even if well-intentioned — cannot avoid that mandate simply because it believes doing so will be more convenient for its applicants.

**[3]** In short, at the summary judgment stage, American has failed to show that it could not reasonably have completed the background checks and so notified the appellants before initiating the medical examination process. It might, for example, have performed the background checks before the appellants arrived in Dallas, kept them in Dallas longer, flown them to Dallas twice, performed the medical examinations at satellite sites or relied on the appellants' private doctors, as it did for explanation of the CBC results. American may be able to prove that alternatives such as these were not feasible and that it could not reasonably have implemented the sequence prescribed by the ADA and FEHA, but on this record it has not. Without such proof, American cannot require applicants to disclose personal medical information — and penalize them for not doing so — before it assures them that they have successfully passed through all non-medical stages of the hiring process.

American argues in the alternative that even if the offers were not real, the company did not violate the ADA or FEHA

because it *evaluated* the appellants' non-medical information before it considered their medical information. Bourk-Suchman asserted that American's recruiting department actually performed the background check for each appellant before receiving the medical department's disposition of "[d]oes not meet AA guidelines."[15] As we have explained, however, the statutes regulate the sequence in which employers collect information, not the order in which they evaluate it.

**[4]** The words of the ADA and FEHA plainly address when employers can make medical inquiries or conduct medical examinations. *See* 42 U.S.C. § 12112(d)(3) (1999) ("A covered entity may require a medical examination after an offer of employment has been made . . . and prior to the commencement of the employment duties."); Cal. Gov't Code § 12940(d) (1999) (regulating when an employer can make an "inquiry . . . which expresses, directly or indirectly, any limitation, specification, or discrimination as to . . . physical disability [or] medical condition . . . or any intent to make that limitation, specification, or discrimination" and when an employer can make "an inquiry as to, or a request for information regarding, the physical fitness, medical condition, physical condition, or medical history of applicants"). As the EEOC has stated explicitly, "[a]n employer may not ask disability-related questions or require a medical examination, *even if* the employer intends to shield itself from the answers to the questions or the results of the examination until the post-offer stage." EEOC's ADA Enforcement Guidance, 2.

**[5]** The focus on the collection rather than the evaluation of medical information is important to the statutes' purposes.

---

[15]Bourk-Suchman stated that the company conducted Fusco's background check in 1997, when he first applied to work for the company in another department. The company also reportedly completed Branton's and Leonel's background checks before the medical department issued their dispositions.

Both the ADA and FEHA deliberately allow job applicants to shield their private medical information until they know that, absent an inability to meet the medical requirements, they will be hired, and that if they are not hired, the true reason for the employer's decision will be transparent. American's attempt to focus on the evaluation rather than the collection of medical information squares with neither the text nor the purposes of the statutes. Whether or not it looked at the medical information it obtained from the appellants, American was not entitled to get the information at all until it had completed the background checks, unless it can demonstrate it could not reasonably have done so before initiating the medical examination process. As to that question, we hold that there are material issues of fact that require reversal of summary judgment on the appellants' claims that American's hiring process violated the ADA and FEHA. We therefore reverse summary judgment on Branton's and Fusco's FEHA claims, Leonel's UCL claim predicated on the ADA and all three appellants' UCL claims predicated on FEHA.

## IV.

**[6]** Article I, section 1 of the California Constitution declares privacy an inalienable right of the people of California. Cal. Const. Art. I, § 1. The right, in many respects broader than its federal constitutional counterpart, protects individuals from the invasion of their privacy not only by state actors but also by private parties. *Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 808-09 (Cal. 1997). The appellants allege that American violated their protected privacy rights by performing CBC tests on their blood without providing notice or obtaining consent.

**[7]** To prove a claim under the California right to privacy, a plaintiff must first demonstrate three elements: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) conduct by the defendant that amounts to a serious invasion of the protected

privacy interest. *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 657 (Cal. 1994). These elements do not constitute a categorical test, but rather serve as threshold components of a valid claim to be used to "weed out claims that involve so insignificant or de minimis an intrusion on a constitutionally protected privacy interest as not even to require an explanation or justification by the defendant." *Loder v. City of Glendale*, 927 P.2d 1200, 1230 (Cal. 1997). The defense should prevail on its motion for summary judgment if it negates, as a matter of law, any one of these three threshold elements.

**[8]** The appellants amply demonstrate the first and third *Hill* elements. As a matter of law, the drawing and testing of blood implicate a legally protected privacy interest. *See Hill*, 865 P.2d at 657-58. "A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected." *Id.* at 658 (*quoting Div. of Med. Quality v. Gherardini*, 156 Cal. Rptr. 55, 60 (Ct. App. 1979)); *cf. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (holding, for the purposes of the federal constitutional right to privacy, that a blood test "infringes an expectation of privacy that society is prepared to recognize as reasonable" and that "chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests").

Further, if the blood tests infringed upon a reasonably held expectation of privacy, the infringement would not be considered de minimis. "The disclosure of . . . private information through testing a bodily substance obtained from an individual . . . constitute[s] [an] intrusion[ ] upon the applicant's constitutional privacy interests that [is] not insignificant or de minimis — [an] intrusion[ ] that would not be permissible in the absence of reasonable justification." *Loder*, 927 P.2d at 1233.

Whether appellants' privacy claims may proceed thus depends on whether they have demonstrated a material issue

of fact as to the reasonableness of their expectations of privacy. Whether a party has a reasonable expectation of privacy is a context-specific inquiry that should not be adjudicated as a matter of law unless "the undisputed material facts show no reasonable expectation of privacy." *Hill*, 865 P.2d at 657. To assess the reasonableness of the appellants' expectations, we consider the customs, practices and physical settings surrounding the blood tests, *id.* at 655, placing particular emphasis on any notice provided or consent obtained. *See Cramer v. Consol. Freightways Inc.*, 255 F.3d 683, 696 (9th Cir. 2001) (en banc); *Hill*, 865 P.2d at 655.

To the extent that the appellants argue that American's mere *drawing* of their blood (as opposed to the *testing* of their blood samples for certain conditions) violated their rights to privacy, we agree with the district court that the appellants had no reasonable expectation of privacy as a matter of law. Under California law, parties have diminished expectations of privacy in the context of a preemployment medical examination. *See Loder*, 927 P.2d at 1232-33. Job applicants should anticipate that a preemployment medical examination may be required. Where, as here, the applicants allow nurses to draw their blood while participating in the preemployment medical examination, they have consented to some form of a blood test. *Cf. id.* (holding that city's requirement that job applicants submit to urinalysis drug testing did not violate applicants' right to privacy where city gave notice and obtained applicants' written consent for testing).

Nonetheless, by consenting to preemployment blood tests, the appellants did not consent to any and all medical tests that American wished to run on their blood samples. Under the California right to privacy, an applicant has a reasonable expectation that an employer will not retrieve private medical information by performing blood tests outside of the "ordinary or accepted medical practice regarding general or preemployment medical exams." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1271 (9th Cir. 1998). "[I]t goes

without saying that the *most basic* violation possible involves the performance of unauthorized tests — that is, the nonconsensual retrieval of previously unrevealed medical information that may be unknown even to plaintiffs." *Id.* at 1269. In the specific context of preemployment medical examinations, "[t]he question of what tests plaintiffs should have expected or foreseen depends in large part upon what preplacement medical examinations usually entail, and what, if anything, plaintiffs were told to expect." *Id.* at 1267.

The circumstances surrounding American's blood tests gave the appellants little reason to expect that comprehensive scans would be run on their blood. American's representatives "ushered" the appellants to the medical department immediately after their interviews; Leonel testified that he felt rushed both to the medical department and then through the examination process. Once at the medical department, the appellants completed multiple forms, none of which indicated that the medical examinations would include blood tests or, if so, what the scope of such blood tests would be. Among these forms, the appellants filled out the Notice and Acknowledgment of Drug Test advising them that the examination included a urinalysis and obtaining their written consent for the specific tests to be run on their urine specimens. They received no comparable form for the blood tests.

American suggests that its medical questionnaire, which made wide-ranging medical inquiries, should have put appellants on notice of the comprehensive blood test. We have already rejected this argument:

> It is not reasonable to infer that a person who answers a questionnaire upon personal knowledge is put on notice that his employer will take intrusive means to verify the accuracy of his answers. . . . Indeed, a reasonable person could conclude that by completing a written questionnaire, he has reduced

or eliminated the need for seemingly redundant and even more intrusive laboratory testing . . . .

*Norman-Bloodsaw*, 135 F.3d at 1268.

Nor did the nurses who assisted the appellants provide information about the nature of the blood tests. Indeed, in responding to Fusco's question about the scope of the test, his nurse provided incomplete and possibly misleading information — that his blood sample would be tested for anemia, only one of the many conditions potentially revealed by the CBC.[16]

American counters that the appellants should nonetheless have expected that a test like the CBC would be run on their blood samples. According to American's former Corporate Medical Director, Dr. McKenas, the CBC is a "standard and routine blood count routinely requested by physicians' offices, clinics and hospitals." American offers no evidence, however, to demonstrate that conducting a CBC without notice or consent is standard practice, either in a traditional medical setting or, more to the point, in a preemployment medical examination in which the applicants do not share a typical medical patient's interest in having his blood subjected to a comprehensive screening. As Dr. McKenas himself acknowledged, the appellants did not enter traditional doctor-patient relationships with American's medical staff.

[9] On this record, American has not demonstrated the absence of a material issue of fact as to the reasonableness of the appellants' expectations that American would not, without first notifying them or obtaining their consent, perform CBC tests on their blood samples. Accordingly, we reverse sum-

---

[16]American's lead nurse, Nurse Becky Doom, later stated that when asked about the blood tests, nurses often replied either that the test was a complete blood count or that the blood would be tested for anemia.

mary judgment on Fusco's privacy claim and all three appellants' UCL claims predicated on the right to privacy.[17]

If, on remand, the appellants prove that they had reasonable expectations of privacy as a threshold matter, the district court must then conduct a traditional balancing test — "weighing and balancing [American's] justification for the conduct in question against the intrusion on [the appellants'] privacy resulting from the conduct." *Alfaro v. Terhune*, 120 Cal. Rptr. 2d 197, 210 (Ct. App. 2002); *see also Loder*, 927 P.2d at 1230 ("[*Hill's* threshold] elements do not eliminate the necessity for weighing and balancing the justification for the conduct in question against the intrusion on privacy resulting from the conduct in any case that raises a genuine, nontrivial invasion of a protected privacy interest.").

V.

**[10]** Summary judgment must also be reversed on the appellants' unfair competition claims. California's UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent" business practice, including actions of employers taken with respect to their employees. Cal. Bus. & Prof. Code § 17200; *see Wilkinson v. Times Mirror Corp.*, 264 Cal. Rptr. 194, 206 (Ct. App. 1989). Under the statute, "[u]nfair competition encompasses anything that can properly be called a business practice which at the same time is forbidden by law." *Id.* The UCL thus "permits violations of other laws to be treated as unfair competition that is independently actionable." *See Kasky*, 45 P.3d at 249.

**[11]** Because the appellants have raised a material issue of fact as to whether American's medical examinations were unlawful under the ADA and FEHA, summary judgment must be reversed on Leonel's UCL claim predicated on the ADA

---

[17]Fusco's claim for intentional infliction of emotional distress, which relies on his right to privacy, is discussed separately below.

and Branton and Fusco's UCL claims predicated on FEHA. *See Alch v. Superior Court*, 19 Cal. Rptr. 3d 29, 77 (Ct. App. 2004) (holding that age discrimination against employees under FEHA constitutes an unlawful business practice under the UCL); *Lazar v. Hertz Corp.*, 82 Cal. Rptr. 2d 368, 375 (Ct. App. 1999) ("In effect, the UCL borrows violations of other laws — such as the state's antidiscrimination laws — and makes those unlawful practices actionable under the UCL."). Because the appellants have raised a material issue of fact as to the lawfulness of American's blood tests under the California Constitution, summary judgment must also be reversed on the appellants' UCL right to privacy claims.

## VI.

**[12]** Finally, Fusco appeals the district court's grant of summary judgment to American on his intentional infliction of emotional distress claim. Fusco has not demonstrated that American's blood tests, even if unlawful, were so "extreme and outrageous" as to surpass "all bounds of decency." *Kraslawsky v. Upper Desk Co.*, 65 Cal. Rptr. 2d 297, 307 (Ct. App. 1997). Summary judgment on this final claim is therefore affirmed.

The judgment of the district court is AFFIRMED in part and REVERSED in part and the case REMANDED for further proceedings. The parties shall bear their own costs on appeal.