**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Plaintiff-Appellee*, v. BNSF RAILWAY COMPANY, *Defendant-Appellant*. | No. 16-35457 D.C. No. 2:14-cv-01488-MJP ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Senior District Judge, Presiding

Argued and Submitted February 8, 2018
Seattle, Washington

Filed August 29, 2018
Amended September 12, 2018

Before: Raymond C. Fisher, Ronald M. Gould,
and Richard A. Paez, Circuit Judges.

Order;
Opinion by Judge Gould

# SUMMARY[*]

## Americans with Disabilities Act

The panel amended the opinion filed on August 29, 2018, in which the panel affirmed the district court's judgment imposing liability on BNSF Railway Company under the Americans with Disabilities Act ("ADA"); vacated the nationwide injunction that prohibited BNSF from engaging in certain hiring practices; and remanded with instructions for the district court to make further factual findings in order to establish the proper scope of the injunction.

Russell Holt received a conditional job offer from BNSF for the position of Senior Patrol Officer contingent on Holt's satisfactory completion of a post-offer medical review. BNSF demanded that Holt submit an MRI of his back at his own cost, which he could not afford. BNSF revoked Holt's job offer, and the Equal Employment Opportunity Commission sued BNSF for violations of the ADA.

The panel held that the EEOC demonstrated all three elements of a 42 U.S.C. § 12112(a) claim by showing (1) that Holt had a "disability" within the meaning of the ADA because BNSF perceived him to have a back impairment; (2) that Holt was qualified for the job; and (3) that BNSF impermissibly conditioned Holt's job offer on Holt procuring an MRI at his own expense because it assumed that Holt had a back impairment. The panel noted that BNSF offered no affirmative defense on appeal; and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

affirmed the district court's holding that the EEOC made a *prima facie* case for a violation of ADA, and was entitled to summary judgment.

The district court held that it could grant an injunction to the EEOC by statute, without looking to the four-factor test for injunctive relief. The panel held that it need not, and did not, decide whether the standard four-factor test for injunctive relief was required in the Title VII/ADA context, because even if the four-factor test applied, that test would be satisfied. Namely, the panel held that Holt suffered an irreparable injury, the remedies at law were inadequate, and the balance of equities, and the public interest weighed in favor of an injunction. The panel concluded that the district court properly entered an injunction.

The panel held that the district court must make further factual findings to support the scope of the injunction; and remanded for the district court to establish the proper scope of the injunction.

---

## COUNSEL

Bryan P. Neal (argued) and Stephen F. Fink, Thompson & Knight LLP, Dallas, Texas; Kenneth J. Diamond, Winterbauer & Diamond PLLC, Seattle, Washington; for Defendant-Appellant.

Susan Ruth Oxford (argued), Attorney; Margo Pave, Assistant General Counsel; Jennifer S. Goldstein, Associate General Counsel; James L. Lee, Deputy General Counsel; U.S. Equal Employment Opportunity Commission, Washington, D.C.; for Plaintiff-Appellee.

John R. Annand and Rae T. Vann, NT Lakis LLP, Washington, D.C.; Kathryn Comerford Todd and Warren Postman, U.S. Chamber Litigation Center Inc., Washington, D.C.; for Amici Curiae Equal Employment Advisory Council and Chamber of Commerce of the United States of America.

Jeffrey L. Needle, Law Offices of Jeffrey L. Needle, Seattle, Washington; Jesse Wing, MacDonald Hoague & Bayless, Seattle, Washington; for Amicus Curiae Washington Employment Lawyers Association.

## ORDER

The opinion in the above-captioned matter filed on August 29, 2018, is amended as follows:

At slip opinion page 5, line 7, delete <apply> and replace with <make further factual findings in order to establish>.

At slip opinion page 5, lines 7–9, delete <traditional four factor test to determine whether to issue a permanent injunction, and, if so, the> and replace with <proper>.

At slip opinion page 26, line 27, delete <its> and replace with <an>.

An Amended Opinion is filed concurrently with this order.

**IT IS SO ORDERED.**

**OPINION**

GOULD, Circuit Judge:

Russell Holt received a conditional job offer from BNSF Railway Company ("BNSF") for the position of Senior Patrol Officer, contingent on Holt's satisfactory completion of a post-offer medical review.  During that medical review, Holt disclosed that he had injured his back four years before, suffering a two-level spinal disc extrusion.  Holt's primary care doctor, his chiropractor, and the doctor BNSF's subcontractor hired to examine Holt all determined that Holt had no current limitations due to his back and found no need for follow-up testing.  Yet as an effective condition to consider him further for the job, BNSF demanded that Holt submit an MRI of his back—at his own cost—or it would treat Holt as having declined the offer.  Holt was in bankruptcy at that time and did not obtain an MRI.  As a result, BNSF revoked Holt's job offer.

The district court concluded that BNSF's actions violated the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008 ("ADAAA") Pub. L. No. 110-325, 122 Stat. 3553, and issued a nationwide injunction that prohibited BNSF from engaging in certain hiring practices.  We affirm the district court's judgment imposing ADA liability, but we vacate the injunction and remand with instructions for the district court to make further factual findings in order to establish the proper scope of the injunction.

**I**

In June 2011, Holt applied for a job with BNSF as a Senior Patrol Officer.  BNSF describes the job duties of a

Senior Patrol Officer as "essentially the same" as a city police officer: Patrol Officers protect the safety of people and property, prevent and respond to criminal activities, and arrest suspects, among other duties. At the time he applied to work for BNSF, Holt was working as a criminal investigator in the Pulaski County Sheriff's Office in Little Rock, Arkansas, where he had worked for five years. After interviewing Holt, BNSF extended him an offer of employment—contingent upon him passing a background check and satisfactorily completing a post-offer medical exam.

BNSF contracts with Comprehensive Health Services ("CHS") to coordinate its medical evaluations nationwide. CHS requires applicants to take a strength test, have a basic physical examination, complete the CHS medical questionnaire, submit to a clinical exam, answer any follow-up questions, and potentially undergo a targeted medical examination. For any cases in which the decision to clear or reject an applicant is not routine, BNSF's medical department, not CHS, decides whether an applicant is medically qualified.

Holt proceeded through CHS's evaluation process. In his health questionnaire, Holt disclosed that he had injured his back in 2007 and suffered back pain as a result. An MRI had shown that he had a two-level disc extrusion, meaning that the nucleus pulposus had escaped from two of his spinal discs. In layman's terms, this was described as the "jellylike material" inside two of Holt's spinal discs having been pushed out of the discs and into the spinal column. A follow-up MRI in 2009 showed that one of Holt's spinal discs had broken off, and a chunk of that spinal disc was then floating

in Holt's spinal canal.[1]  After his back injury, Holt had regularly visited a chiropractor for "maintenance."

Holt also suffered from knee pain in March 2011, as well as some associated back pain, which led him to see his primary care doctor, Dr. Richard Heck.  Dr. Heck stated that an MRI of Holt's knee might be warranted, but one was never ordered, and Holt's knee and back pain appears to have resolved with medication, chiropractic care, and physical therapy.

On September 21, 2011, the day after Holt submitted his questionnaire disclosing his prior back injury, a CHS nurse called him with more questions about his back.  Holt told her that he had kept the same job after his back was injured and that he had no current back issues.  The nurse asked him to submit his medical records relating to his back.  Within a week, Holt had submitted his medical records; a letter from his chiropractor stating that Holt had responded well to care; the 2007 MRI; and a note from Dr. Heck—who had just reexamined Holt that week—stating that Holt had no current back problems and had functioned normally since 2009.

CHS's subcontractor, Concentra, then assigned Dr. Marcia Hixson to conduct a medical exam of Holt.  Dr. Hixson was informed generally of Holt's prior back injury,[2] and she said that she looked at his back a "little more closely" than usual as part of her "very thorough" exam.  Dr. Hixson's exam revealed no issues—with Holt's back or

---

[1] BNSF's doctor described this as progression in a "non-positive direction," while Holt's primary care doctor opined that in some areas Holt's back looked better, while in other areas his back looked worse.

[2] Dr. Hixson was not provided with any of Holt's prior medical records.

otherwise—that would prevent him from performing the duties of the Patrol Officer job, and she saw no need for a follow-up exam; Dr. Hixson relayed these conclusions on the written examination report.

CHS then sent its medical file on Holt to BNSF for additional review. BNSF's Medical Officer, Dr. Michael Jarrard, reviewed Holt's file. Dr. Jarrard decided that he wanted additional information before he made an informed decision about whether Holt could perform the Senior Patrol Officer job. Specifically, on November 11, 2011, Dr. Jarrard requested (1) a current MRI and radiologist's report on Holt's back, (2) Holt's pharmacy records for the past two years for prescriptions related to treatment of Holt's back pain, and (3) any other medical records for Holt from the prior two years, including chiropractic notes. Dr. Jarrard stated that he wanted this information because—although Holt reported no current symptoms and all the reviewing doctors had agreed that he could perform the job—Dr. Jarrard was concerned that there was an underlying pathology that might disqualify Holt from the job. Dr. Jarrard told CHS to tell Holt that the additional information was necessary "due to [the] uncertain prognosis of [Holt's] back condition."

What happened next is the subject of some dispute between the parties. But based on the record, this picture emerges: In November, Holt contacted Dr. Heck's office and stated that he needed an MRI for his job application with BNSF. It is not clear whether Holt spoke directly with Dr. Heck about this request, although it appears likely that he did. In any event, it is uncontroverted that Holt at least spoke with Dr. Heck's office about getting an MRI and was told that because he was not currently in pain, the MRI was not medically necessary and so would not be covered by his

insurance. An employee from Dr. Heck's office followed up to tell Holt that the office had checked with Holt's insurance company, and the insurance company had confirmed that it would not cover the MRI.

Holt then investigated paying out-of-pocket for the MRI, and was told it would cost more than $2,500 to obtain an MRI without a doctor's referral. Holt was in bankruptcy at the time of his job application. Holt states that he could not afford to pay for an MRI, an allegation BNSF disputes. We do not rely on Holt's representation about his inability to pay in arriving at our holding here. It is not disputed that Holt told BNSF about the high cost of the MRI and that BNSF responded that he was expected to bear the cost of the MRI himself.

After some back-and-forth communications with BNSF in which Holt asked to have the MRI requirement waived, he was told that without the MRI he would not be hired. Holt did not obtain an MRI,[3] and so on December 15, 2011, BNSF designated Holt as having declined the conditional job offer.[4]

---

[3] Holt also did not provide the other medical records that BNSF requested, but without the MRI, it would not have mattered whether Holt gave them to BNSF—he still would have been treated as having declined the job offer.

[4] It is undisputed that Holt later had serious back issues requiring him to undergo surgery in December 2013. Holt testified that those issues caused him to take a six-week medical leave, but that he worked as a law enforcement officer before and after the surgery. Regardless, that Holt later had back problems is not relevant to whether BNSF's actions were justified on the information it had before it in 2011. *See Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999).

Holt next filed a charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC then sued BNSF for alleged violations of the ADA. BNSF moved to dismiss the complaint. The district court denied that motion, holding that the EEOC had properly pleaded a claim under the ADA, 42 U.S.C. § 12112(b)(6). The parties proceeded through discovery, and both sides moved for summary judgment—BNSF moving for summary judgment as to the entire case and the EEOC requesting only partial summary judgment on the issue of ADA liability.

The district court granted the EEOC's motion for partial summary judgment, and denied BNSF's motion. Although the district court had held in denying BNSF's motion to dismiss that the EEOC could bring its claim under § 12112(b)(6), the district court reversed course in its summary judgment order. It instead concluded that § 12112(b)(6) was a disparate impact, not a disparate treatment provision, and that the EEOC could not make out a § 12112(b)(6) claim absent a showing that BNSF had applied an across-the-board policy.

The district court held that the EEOC could, however, make out a "generic § 12112(a) claim" against BNSF. It determined that the EEOC had established all three elements of a *prima facie* case for disability discrimination under § 12112(a): The EEOC had shown that (1) BNSF had "regarded" Holt as having a disability due to his 2007 back injury; (2) Holt was qualified for the job; and (3) BNSF discriminated against Holt by requiring an MRI because BNSF regarded Holt as having a disability. Holding that BNSF did not offer evidence sufficient to support any affirmative defense, the district court granted partial summary judgment to the EEOC.

The parties then reached an agreement on the amount to be awarded for damages, although BNSF did not waive its appellate rights. The district court adopted the damages agreement.

Subsequently, the parties briefed the issue of injunctive relief, and the district court entered a nationwide injunction. The district court concluded that because it found BNSF to have purposefully engaged in an unlawful employment practice and BNSF had expressed no intention of changing its behavior, by statute injunctive relief against BNSF was authorized under 42 U.S.C. § 2000e-5(g)(1). The district court's injunction mandated that "BNSF must bear the cost of procuring any additional information it deems necessary to complete a medical qualification evaluation." It also required that "[i]f BNSF chooses not to procure additional information, it must complete the medical examination process, i.e., it must use the medical information it does have to make a determination about whether the applicant is medically qualified for the job for which the applicant received the conditional offer." BNSF appeals.

## II

We review *de novo* the district court's ruling on cross-motions for summary judgment. *Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011). We can consider together the denial of BNSF's motion for summary judgment and the grant of the EEOC's motion for summary judgment. *See Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002). "Summary judgment is appropriate if there is no genuine dispute of material fact viewing the evidence in the light most favorable to the nonmoving party." *Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 773 (9th Cir. 2018) (internal quotation marks and citation omitted).

We review for abuse of discretion the district court's decision to grant a permanent injunction, but review *de novo* the district court's legal conclusions underlying the decision. *Ting v. AT&T*, 319 F.3d 1126, 1134–35 (9th Cir. 2003).

## III

Under the ADA, employer medical inquiries are divided into three categories, each with different rules: (1) inquiries conducted before employers make offers of employment; (2) inquires conducted "after an offer of employment has been made but prior to the commencement of employment duties ('employment entrance examinations')"; and (3) inquiries conducted at any later point. *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1273 (9th Cir. 1998) (alterations and quotation marks omitted); *see also* § 12112 (d)(2)–(4). This case concerns the second category of rules, which govern employment entrance examinations.

"Unlike examinations conducted at any other time, an employment entrance examination need *not* be concerned solely with the individual's 'ability to perform job-related functions,' § 12112(d)(2); nor must it be 'job-related or consistent with business necessity,' § 12112(d)(4)." *Norman-Bloodsaw*, 135 F.3d at 1273. However, these examinations must still be used in accord with the ADA and cannot violate the ADA's generic disability prohibitions set forth in § 12112(a). 42 U.S.C. § 12112(d)(1); *see also* 29 C.F.R. § 1630.14(b)(3).

Under § 12112(a) of the ADA, an employer is generally prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures [or] hiring . . . and other terms, conditions, and privileges of employment." The EEOC

contends that BNSF violated this prohibition.  To make out a *prima facie* case for a violation of § 12112(a), the EEOC must show: (1) that Holt had a disability within the meaning of the ADA, (2) that Holt was qualified for the position, and (3) that BNSF discriminated against Holt because of his disability.  *See Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013).  The parties contend, and we agree, that this case turns on the first and third prongs: whether Holt had a disability and whether BNSF discriminated against Holt because of his disability.

## A.

We first consider whether Holt had a disability within the meaning of the ADA.  *See Clark Cty. Sch. Dist.*, 727 F.3d at 955.  The EEOC contends that BNSF "regarded" Holt as having a disability.  Under the ADA, a person with a "disability" is defined to include an individual who is "regarded as having" an impairment.  42 U.S.C. § 12102(1)(C).[5]  The ADA currently provides that:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

---

[5] On appeal, the EEOC does not advance its prior argument that Holt had a record of disability based on his back injury.

*Id.* § 12102(3)(A). Notably, the ADAAA discarded the requirement that an impairment had to substantially limit a major life activity for the discrimination to be actionable under the "regarded as" prong. *Compare* 42 U.S.C. § 12102(2) (2008), *with* 42 U.S.C. § 12102(3)(A) (2009); *see also Mercado v. Puerto Rico*, 814 F.3d 581, 588 (1st Cir. 2016). But the ADAAA does require that an impairment not be "transitory" or "minor." *Id.* § 12102(3)(B). In regarded-as cases, thus, a plaintiff must show that the employer knew that the employee had an actual impairment or perceived the employee to have an impairment, and that the impairment was not transitory or minor. *See Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016).**[6]**

The parties agree that for BNSF to have regarded Holt as having a disability, BNSF must have regarded him as having a *current* impairment. This reading comports both with the statutory text, which prohibits discrimination on the basis of an "actual or perceived impairment" in the present tense, 42 U.S.C. § 12102(3)(A), and with out-of-circuit case law, *see Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1113 (8th Cir. 2016) ("The ADA prohibits an employer from discriminating against an individual on the basis of a *presently existing* 'physical impairment' as that term is defined under the Act." (emphasis added)). The EEOC bears the burden of establishing that BNSF regarded Holt as having an impairment when BNSF requested the MRI.

By regulation, the EEOC has defined an impairment as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body

---

**[6]** While the EEOC must also show that Holt was "subjected to an action prohibited under [the ADA]," 42 U.S.C. § 12102(3)(A), we consider that issue in analyzing the third prong of a § 12112(a) claim.

systems." 29 C.F.R. § 1630.2(h)(1). The definition of "impairment" remained unchanged following the enactment of the ADAAA. 29 C.F.R. § 1630(h), App. The ADAAA, however, added language requiring that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). As a result, we construe "perceived impairment," which forms part of the definition of "disability," broadly.

BNSF argues that it did not perceive Holt to have an impairment; its Medical Officer was simply unsure of the state of Holt's back and so sought more information. BNSF cites *Lanman v. Johnson County*, 393 F.3d 1151 (10th Cir. 2004), for the proposition that merely asking for an exam does not suggest that an employer perceived an employee to have an impairment. The EEOC argues that BNSF actually knew Holt had a current impairment because Holt's disc extrusion was a permanent condition. The EEOC points to Dr. Jarrard's deposition, during which he was asked whether "a disc extrusion, the material within the vertebra, ever regenerate . . . or be restored?" Dr. Jarrard answered, "No." The EEOC argues that because the nucleus pulposus would never be restored, Holt had an ongoing impairment, of which BNSF was aware.

First, BNSF's citation to *Lanman* is not persuasive. There, Lanman was a county sheriff's deputy. *Id.* at 1153. After receiving several reports that Lanman had behaved in a troubling manner, the county placed her on leave pending the outcome of a psychiatric evaluation. *Id.* at 1153–54. Lanman argued that she had been discriminated against in violation of the ADA. *Id.* at 1154. The Tenth Circuit disagreed. *Id.* at 1157. The court questioned whether

Lanman had shown that the county perceived her as having an impairment, and cited the ADA for the proposition that an employer may "order a medical exam when it is 'shown to be job-related and consistent with business necessity.'" *Id.* (quoting 42 U.S.C. § 12112(d)(4)(A)). Critically, however, the court held that even if Lanman *had* been able to demonstrate the county regarded her as impaired, she was not able to show the county believed the impairment "substantially limited her in at least one major life activity." *Id.* Thus, Lanman was not "disabled" within the meaning of the ADA. *Id.* at 1158.

*Lanman* is not helpful here, because the principal basis of its holding has been superseded by statute. The ADA no longer requires a showing of a substantially limiting impairment, following the 2008 enactment of the ADAAA. *Compare* 42 U.S.C. § 12102(2) (2008), *with* 42 U.S.C. § 12102(3)(A) (2009). Thus, the EEOC need show only that BNSF considered Holt to have an impairment—not a substantially limiting impairment. *See* § 12102(3)(A); *Mercado*, 814 F.3d at 588. The other cases BNSF cites are similarly unhelpful.

Second, we decline to parse the nature of Holt's medical condition. Whether or not Holt's disc extrusion was a permanent condition is irrelevant here. In requesting an MRI because of Holt's prior back issues and conditioning his job offer on the completion of the MRI at his own cost, BNSF assumed that Holt had a "back condition" that disqualified him from the job unless Holt could disprove that proposition. And in rejecting Holt's application because it lacked a recent MRI, BNSF treated him as it would an applicant whose medical exam had turned up a back impairment or disability. BNSF chose to perceive Holt as having an impairment at the

time it asked for the MRI and at the time it revoked his job offer.

BNSF cannot hide behind its argument that there was some uncertainty as to the actual state of Holt's back when it assumed that Holt had a back condition that disqualified him from the Senior Patrol Officer job. Construing the definition of "perceived impairment" to encompass situations where an employer assumes an employee has an impairment or disability is consistent with the ADAAA's mandate that "the definition of disability . . . be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." *See* 42 U.S.C. § 12102(4)(A). We conclude that BNSF perceived Holt to have an impairment for the purposes of the ADA.

## B

We next address whether BNSF discriminated against Holt because of his perceived impairment. *See Clark Cty. Sch. Dist.*, 727 F.3d at 955. Specifically, we consider whether it was permissible for BNSF to condition Holt's job offer on Holt obtaining an MRI at his own expense. This is not how the EEOC frames the discriminatory act—it instead refers to the "rescission of [Holt's] job offer" and focuses on the argument that Holt was unable to complete the testing process. But the key question, as we see it, is whether BNSF was entitled to condition Holt's continuation through the hiring process on Holt providing an MRI at his own cost. If BNSF was entitled to do this, then disqualifying Holt because he failed to cooperate in the completion of the medical screening process, whatever the reason he could not complete the process, was likely permissible. *Cf. Roberts v. City of Chicago*, 817 F.3d 561, 565–66 (7th Cir. 2016) (finding no ADA violation where plaintiffs were not hired

because the first eleven applicants to complete medical testing were hired, and plaintiffs were delayed in completing the medical testing because they were required to go through additional screening because of their disabilities); *Leonel v. Am. Airlines, Inc.*, 400 F.3d 702, 709 n.13 (9th Cir. 2005) ("We do not suggest that, when a medical examination is conducted at the proper time and in the proper manner, an applicant has an option to lie, or that an employer is foreclosed from refusing to hire an applicant who does."); *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 961 n.5 (10th Cir. 2002) (suggesting that it is permissible to fire an applicant for lying on a medical questionnaire); *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998).

The ADA prohibits discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Requiring that an applicant pay for an MRI—or else lose his or her job offer—because the applicant has a perceived back impairment is a condition of employment imposed discriminatorily on a person with a perceived impairment. Moreover, given the indisputably high cost of MRIs, requiring an MRI as a condition of employment will for many individuals mean a disqualification from participating in the process.

BNSF, however, argues that § 12112(d)(3) authorizes exactly this type of action. BNSF highlights the following text of § 12112(d)(3):

> A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of

such applicant, and may condition an offer of employment on the results of such examination.

§ 12112(d)(3). BNSF fails to mention, however, that the statute qualifies this by stating that these medical exams can only be given if "all entering employees are subjected to such an examination regardless of disability." § 12112(d)(3)(A).

BNSF further points out that the EEOC's 1995 Enforcement Guidance states that follow-up exams are permissible so long as they are "medically related to previously obtained medical information." This would appear to be a necessary implication of allowing employers to conduct medical examinations—it would be an odd and incomplete medical exam that could not include follow-up inquiries or testing based on red flags raised in the initial exam. But this does not support BNSF's position that the prospective employee may be forced to shoulder the cost of such follow-up exams.

It is true that follow-up exams will frequently be required of people with disabilities or impairments because they have disabilities or impairments. But this additional burden is implicitly authorized by § 12112(d)(3)'s authorization of medical exams. *See Roberts*, 817 F.3d at 566. Indeed, the EEOC concedes that BNSF could have required Holt to get an MRI if BNSF had offered to pay for the MRI. The dispute is over cost allocation. Although it authorizes testing that may disproportionately affect persons with disabilities, § 12112(d)(3) does not, by extension, authorize an employer to further burden a prospective employee with the cost of the testing, however necessary the testing may be. The statute is silent as to who must bear the costs of testing.

BNSF argues that because the ADA allows an employer to "require a medical examination" and not to merely "give" or "request" one, the ADA empowers employers to force applicants to pay for the costs any of testing. BNSF reads too much into the word "require." Here, "require" is properly understood to mean that an employer can compel a medical exam, and that a conditionally hired person's participation in the medical exam is not optional. *See Requirement*, Black's Law Dictionary (10th ed. 2014) ("[s]omething that must be done"). But the word "require" indicates nothing about who must bear the costs of any medical testing. Accordingly, we hold that the standard anti-discrimination provision of the ADA and the ADA's policy purposes should control on the issue of who must bear the costs of testing.

An employer would not run afoul of § 12112(a) if it required that everyone to whom it conditionally extended an employment offer obtain an MRI at their own expense. [7] That employer would be imposing a cost on its prospective employees across-the-board, with no regard for their actual or perceived disability or impairment status. Where, however, an employer requests an MRI at the applicant's cost only from persons with a perceived or actual impairment or disability, the employer is imposing an additional financial burden on a person with a disability because of that person's disability.[8] In the case of an

---

[7] This is not to say that such an action would necessarily be legal; we merely note that § 12112(a) would not prohibit it.

[8] For these reasons, *O'Neal v. City of New Albany*, 293 F.3d 998 (7th Cir. 2002), which BNSF cites extensively, is not relevant here, because there the plaintiff conceded that he did not have a disability and did not

expensive test like an MRI,[9] making an applicant bear the cost will effectively preclude many applicants, which is at odds with the ADA's aim to increase opportunities for persons with disabilities.

In short, requiring an applicant to pay for follow-up testing is distinct from merely requiring an additional exam for a person with a disability if an additional exam is necessary to complete the medical examination contemplated in § 12112(d)(3). But it is not at all necessary that a person with an impairment pay for an exam for a thorough exam to be completed. To construe the statute otherwise would be to constrain and limit the general protections of the ADA beyond the necessary implications of the medical testing provision.

Further, elsewhere the ADA puts the financial burden on employers. The ADA requires *employers* to pay for reasonable accommodations unless it is an undue hardship— it does not require employees to procure reasonable accommodations at their own expense. 42 U.S.C. § 12112(a), (b)(5)(A); *see also* 29 C.F.R. § 1630.2(o)(4).[10]

---

argue that the burden of paying for testing was imposed on him on account of his disability. *See id.* at 1010.

[9] This is not to imply that an employer may require a prospective employee with a perceived or actual impairment to pay for an inexpensive medical test. On the contrary, our holding here applies regardless of the cost of the medical test at issue, as well as the employee's ability to pay.

[10] While the Fourth Circuit has found no ADA violation where an employer required an employee to obtain, at his own cost, a functional capacity evaluation before returning to work, the court did not explain why it was permissible to require the employee to pay for testing. *See Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir. 1997). The

Allowing employers to place the burden on people with perceived impairments to pay for follow-up tests would subvert the goal of the ADA to ensure that those with disabilities have "equality of opportunity," § 12101(a)(7), and would force people with disabilities to face costly barriers to employment.

Additionally, requiring employers to bear the costs of this testing would discourage unnecessary and burdensome testing of persons with disabilities or impairments, and prevent employers from abusing their ability to require tests. As *amicus curiae* Washington Employment Lawyers Association points out, if employers are not required to pay for the additional medical tests that they require of people with disabilities, then employers might use the cost of medical testing to screen out disabled applicants.[11] Putting the burden to pay on employers helps to ensure that

---

court instead focused on the fact that the requested test was "job-related and consistent with business necessity" under § 12112(d)(4). *Id.* at 246. The court also noted that in the absence of any testing, the plaintiff there could not make out a *prima facie* case of discrimination, as he could not demonstrate that he had a disability or that he was capable of doing his job with or without a reasonable accommodation. *Id.* at 246–47. That case also predated the ADAAA. Given the different factual context and that the court did not discuss why it was appropriate to require an employee to pay for testing, we are not persuaded that we should follow the *Porter* court here.

[11] BNSF argues that this concern should not have any bearing here because requesting medical information for the purpose of deterring or screening out disabled applicants would be impermissible under the ADA. BNSF's argument ignores both the difficulty an applicant would face in proving discriminatory intent and that while an employer may not intentionally seek to screen out disabled applicants, a cavalier attitude toward applicant-paid testing may effectively screen out persons with disabilities in a way that violates the ADA.

employers do not abuse their power to require testing at the post-offer, pre-employment stage.

BNSF also argues that the EEOC did not show that BNSF acted with a discriminatory motive, or that BNSF's justifications for its behavior were pretextual. But as we have held *en banc*, where it is clear that an action was taken because of an impairment or perception of an impairment, no further inquiry or burden-shifting protocol is necessary to establish causation. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007). Here, there is no question that BNSF conditioned Holt's job offer on Holt obtaining an up-to-date MRI of his back because of BNSF's assumption that Holt had a back impairment. No further causation inquiry is necessary.

## C

The final element that we must consider on the § 12112(a) claim is whether Holt was a "qualified individual with a disability." This term means an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). BNSF makes no attempt to argue that Holt was not an otherwise qualified individual. Nor could it credibly do so: Holt received a conditional offer of employment, at the time of his application he was working as a law enforcement officer, and he was cleared by all three doctors who physically examined him.

That BNSF does not contest this element is telling. Effectively, BNSF has conceded that the medical information it had on Holt at the time it rejected him demonstrated that Holt could perform the Senior Patrol Officer job—yet BNSF still demanded that Holt procure an

MRI at his own expense. This is not a case where the medical information previously adduced had been disqualifying and BNSF had provided Holt one last chance to show his ability to perform the job. In such a case, § 12112(a) would not prevent BNSF from choosing not to hire Holt because Holt would be unable to show he was "otherwise qualified for the job." BNSF had ample evidence that Holt could do the job. Yet in the face of all that evidence, BNSF nonetheless decided to impose the burden of procuring an expensive medical test on Holt because of its perception that Holt had an underlying back problem.

We conclude that the EEOC has demonstrated all three elements of a § 12112(a) claim by showing (1) that Holt had a "disability" within the meaning of the ADA because BNSF perceived him to have a back impairment; (2) that Holt was qualified for the job; and (3) that BNSF impermissibly conditioned Holt's job offer on Holt procuring an MRI at his own expense because it assumed that Holt had a back impairment. BNSF offers no affirmative defense on appeal. We affirm the district court's holding on ADA liability.[12]

## IV

BNSF argues that the district court erred in issuing its injunction, both because it applied the wrong legal standard and because it could not issue a nationwide injunction. BNSF argues that controlling Supreme Court authority required the district court to use the standard four-factor test—which considers (1) whether a plaintiff has suffered an

---

[12] Because we hold that the district court correctly concluded that the EEOC was entitled to summary judgment on its § 12112(a) claim, we do not reach the EEOC's alternative argument that BNSF violated § 12112(b)(6).

irreparable injury, (2) whether remedies available at law are inadequate to compensate for that inquiry, (3) the balance of hardships, and (4) the public interest—before issuing a permanent injunction. *See eBay Inc. v. MercExchange*, *LLC*, 547 U.S. 388, 391 (2006). In recent years, the four-factor test has commonly been applied by the Supreme Court to assess the propriety of injunctive relief. *See id.*; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

The district court held that it could grant an injunction to the EEOC by statute, without looking to the four-factor test. It reached this conclusion because the ADA authorizes any person who proves an ADA violation to seek the remedies provided for in Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12117(a). The district court reasoned that under Title VII, when a court finds that a defendant has intentionally engaged in an unlawful employment practice, "the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate." *Id.* § 2000e-5(g)(1). Indeed, both our court and the Supreme Court have granted permanent injunctions in the Title VII context without analyzing the four-factor test. *See, e.g.*, *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1092 (1983) (Marshall, J., concurring); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361 (1977); *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987). Because the district court had already held that BNSF had violated the ADA and because it found that BNSF had no intention of ceasing its unlawful practice, the district court determined that an injunction was authorized by statute.

We need not and do not decide today whether *eBay* and *Monsanto* require the application of the four-factor test in the

Title VII/ADA context because we determine that even if the four-factor test is applied, that test would be satisfied here. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012). First, if BNSF continued its practice, Holt and others like him would suffer the dignitary harm of being falsely told that their disability or perceived impairment rendered them unfit for certain work. *See Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011) ("[T]he loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages."). The harms a person suffers when denied a job on the basis of a disability are "emotional and psychological—and immediate." *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988). And we are satisfied that these harms constitute irreparable injury. *See id.* Relatedly, while Holt can receive back pay and reinstatement at law, no legal remedy can fully right the wrong of such a dignitary affront. *See id.* We thus conclude that the second factor—insufficient remedies at law—is satisfied here too.

Further, preventing BNSF from continuing to discriminate in its hiring practices does not result in any hardship to BNSF; BNSF is merely being forced to stop doing what it is not entitled to do. By contrast, absent an injunction, those with disabilities or perceived disabilities who receive conditional offers from BNSF will face serious hardship: they will either be deprived of a job on the basis of their disability, or else forced to pay large sums out of their own pocket for additional testing. The third factor is therefore satisfied. Finally, the public interest—the fourth factor—is served by preventing employment discrimination. *See Gen. Tel. Co. of the Nw. v. Equal Emp't Opportunity*

*Comm'n*, 446 U.S. 318, 326 (1980) ("When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination."). We agree with the district court and hold that an injunction was appropriately entered here.

However, we agree with BNSF that the district court must make adequate factual findings to support the scope of the injunction. *See City & Cty. of S.F. v. Trump*, No. 17-17478, 2018 WL 3637911, at *12–13 (9th Cir. Aug. 1, 2018). We observe preliminarily that there are some reasons to support an injunction like that previously entered here. Although BNSF operates in dozens of states, its medical screening decisions are made out of a central medical office in Texas. Holt's own case demonstrates the difficulty of imposing a geographic constraint of the sort BNSF advocates: Holt lived in Arkansas at the time of his application, applied for a position in Washington, and was rejected at the direction of employees in BNSF's Texas office.[13] But the district court did not make factual findings or articulate its reasoning, and so we cannot yet properly review the scope of the injunction. Whether an injunction should be entered in exactly the form and scope of the injunction previously entered by the district court depends on the further review and findings to be made by the district court on remand.

---

[13] BNSF argues that we should cabin the scope of any injunction to the Ninth Circuit because other circuits have authorized the conduct at issue. We need not decide this issue, which will be considered in the first instance by the district court. However, we observe that no other circuit court has yet ruled on the permissibility of requiring persons who have disabilities or perceived disabilities to pay for their own follow-up testing during the hiring process.

We therefore vacate the injunction and remand for the district court to make further factual findings in order to establish the proper scope of the injunction.

Each party shall bear its own costs on appeal.

**AFFIRMED in part; VACATED in part and REMANDED.**